PER CURIAM.
Donte Hall appeals his conviction for first-degree murder and his sentence of *669 death.[1] For the reasons that follow, we affirm his conviction and sentence.
I. FACTS AND PROCEDURAL BACKGROUND
Donte Hall was sentenced to death for the September 2006 murder of Anthony Bernard Blunt. The jury found Hall guilty of conspiracy to commit armed robbery, armed burglary, robbery with a firearm, attempted felony murder of Joshua Daniel, attempted felony murder of Willie Shelton, first-degree murder of Keson Evans, and first-degree murder of Anthony Blunt.
The evidence at trial revealed that on September 8, 2006, 22-year-old Hall learned that his girlfriend, 18-year-old Angel Glenn, had been hired to dance and strip at a house party that night. Angel had been told she would make a lot of money for dancing, and Hall told Angel that he planned to rob the attendees of the party. Hall, along with his twin brother, Dante, and acquaintances Shoo-Shoo and Pig, followed Angel and her two fellow dancers from Orlando to the party in Eus-tis. At the party, several men were present, drinking alcohol, smoking marijuana, and using ecstasy. The girls entered the house, went into a back room, took ecstasy pills, and began changing clothes. Hall stayed in communication with Angel via cell phone while she was in the room, asking her how many men were in the house, whether there were guns in the house, and when the party would begin. After some delay, music began playing and the girls began dancing and stripping.
Within approximately five or ten minutes, Hall entered the house, carrying an assault rifle and saying he was going to “make this choppa dance.” Hall was followed by Dante, Shoo-Shoo, and Pig, and all four men were wearing dark clothing and had their faces partially covered. They were carrying handguns and assault rifles. The attendees of the party, as well as the three dancers, gathered in the living room.
The intruders started shooting, and the lights went out. The gunmen demanded money and told the partygoers to get down on the ground, and the partygoers began taking off their jewelry and handing it to the gunmen. The seized items included gold chains, bracelets, watches, and a Gucci bag containing about $1500 in cash.
Eyewitness testimony established that Hall was the first to fire a gun and that Hall did most of the talking. In order to stop the shooting and distract the gunmen, partygoer Keson Evans stated that there was a box of money in the back room. Hall went to the back room but found the door locked; he returned to the living room and fired his gun again, fatally shooting Evans in the head.
The four gunmen were in the house for ten minutes or less. During that time, Willie “Jay” Shelton, William Robinson, Joshua Daniel, Keson Evans, and Anthony Blunt were each shot. Daniel was the first to be shot, and he suffered several gunshot wounds to his hands, thighs, abdomen, and torso. Later, after being rushed to the hospital, Daniel spent eighteen hours in surgery to remove the bullets and treat his approximately twenty entrance and exit wounds, which were very severe but ultimately nonfatal. Shelton was shot once in the stomach and once in the forearm. His injuries caused him to be hospitalized for two years. Robinson was shot in the stomach and in the shoulder. Blunt was fatally shot in his chest, right thigh, and left hand. Evans was shot in the face and the right thigh and died as a result.
*670 The gunmen fled the house immediately after Evans was shot. The three women then left the house together with Angel driving them back to Orlando. Hall called Angel, asking her whether the women were okay and telling them to calm down. Hall and Angel arranged to meet at a gas station on a major road leading from Eus-tis back to Orlando. At the gas station, Hall got out of Dante’s car and into Angel’s car, carrying a gun and stolen property from the robbery. During the car ride, Hall stated that he was angry because he did not get enough money and the robbery did not go as he had planned. Angel dropped Hall off at his mother’s house, where he was living at the time.
The next morning, Angel went to Hall’s mother’s house to see him at his request. Twin brother Dante .and Hall’s mother were also home. Dante was pulling jewelry from the robbery out of a Gucci bag, and the twins discussed what they would do with the jewelry, how much it was worth, and how they would make money off of it. Hall gave some of the jewelry to Dante’s girlfriend and instructed her to pawn it. Some of the robbery victims later identified jewelry that had been pawned, and Angel identified the same jewelry as jewelry she had seen in Hall’s possession at his mother’s house the day after the robbery.
The following day, Dante went to the hotel where Hall, Angel, and Angel’s one-year-old son were staying and discussed with Hall the logistics of pawning the jewelry from the robbery. The twin brothers left the hotel together with most of the jewelry. Hall also gave Angel a few of pieces of jewelry to pawn, for which she received $1,000 that she then gave to Hall. Over the next several days, Hall made phone calls to Shoo-Shoo and Pig to discuss the jewelry and how the proceeds would be divided.
Angel was soon arrested for pawning the stolen jewelry and was in jail for several weeks, during which time she lied to police about the events of September 9 because she was frightened for her family’s wellbeing. Meanwhile, one of the other dancers from the party, Nikita Jackson, told police what had happened the night of the robbery and murders. Eventually, Angel also admitted to the police what had happened and agreed to testify against Hall.
During the penalty phase, the court received expert testimony regarding Hall’s mental health. Two psychologists testified that Hall was of very low intelligence with an IQ in the borderline range of intellectual abilities. Both psychologists also testified that Hall had some history of substance abuse.
Using special verdict forms, the jury voted unanimously that three aggravating circumstances were established beyond a reasonable doubt for the murders of Anthony Blunt and Keson Evans: (1) that Hall had a prior violent felony conviction; (2) that he knowingly created a great risk of death to many people; and (3) the murders were committed for pecuniaiy gain. Additionally, the jury voted eleven to one that the murder of Anthony Blunt was especially heinous, atrocious or cruel.[2] The jury voted eight to four in favor of a death sentence for the murder of Blunt and recommended a life sentence for the murder of Evans.
After conducting a Spencer[3] hearing, the trial court followed the jury’s recommen *671 dation of death for the murder of Anthony Blunt, concluding that the four aggravating factors outweighed several mitigating factors. Specifically, the trial court found the following aggravators for Blunt’s murder: (1) Hall was contemporaneously convicted of armed burglary, armed robbery, attempted felony murder of Willie Shelton, attempted felony murder of Joshua Daniel, and first-degree murder of Keson Evans (some weight); (2) Hall created a great risk of death to many people (great weight); (3) Hall committed the murder for pecuniary gain (great weight); and (4) Hall committed the murder of Blunt in an especially heinous, atrocious, or cruel manner (great weight). The trial court found one statutory mitigating circumstance: Hall’s capacity to conform his conduct to the requirements of the law was substantially impaired (some weight). The court also found the following nonstatutory mitigating circumstances: (1) Hall demonstrated appropriate courtroom behavior (minimal weight); (2) Hall’s family background included generational drug and alcohol use (some weight); (3) Hall’s family background included generational criminal behavior (some weight); (4) Hall did not grow up with good role models (some weight); (5) Hall grew up in a dangerous neighborhood that reinforced drug use (some weight); (6) Hall may have been abused as a child (minimal weight); (7) Hall had many different living arrangements as a child (minimal weight); (8) Hall suffered from attention deficit disorder and is considered borderline mentally retarded (some weight); and (9) Hall has an extensive history of drug and alcohol abuse (minimal weight).
II. ISSUES RAISED ON APPEAL
Hall claims that (A) the trial court erred by instructing the jury on and finding the heinous, atrocious, or cruel (HAC) aggra-vator for the murder of Anthony Blunt and that (B) Hall’s death sentence is disproportionate.[4] Neither claim warrants relief.

A. Heinous, Atrocious, or Cruel Aggravator

Hall claims that the trial court erred in instructing the jury on and finding the HAC aggravator for the murder of Anthony Blunt. We disagree.
Florida law provides that “evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant and shall include matters relating to any of the aggravating or mitigating circumstances.” § 921.141(1), Fla. Stat. (2006). The trial court must instruct the jury on any aggravators for which credible and competent evidence is presented. Aguirre-Jarquin v. State, 9 So.3d 593, 607 (Fla.2009). And this Court reviews a trial court’s decision to find an aggravator for competent substantial evidence. See id.
The HAC aggravating circumstance applies when “[t]he capital felony was especially heinous, atrocious, or cruel.” § 921.141(5)(h), Fla. Stat. (2006). This Court has explained the following regarding the HAC aggravator:
HAC focuses on the means and manner in which the death is inflicted and the immediate circumstances surrounding the death, rather than the intent and motivation of a defendant, where a victim experiences the torturous anxiety and fear of impending death. Thus, if a victim is killed in a torturous manner, a *672 defendant need not have the intent or desire to inflict torture, because the very torturous manner of the victim’s death is evidence of a defendant’s indifference.
Barnhill v. State, 834 So.2d 836, 849-50 (Fla.2002) (citation omitted). “[F]ear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel.” Lynch v. State, 841 So.2d 362, 369 (Fla.2003) (quoting James v. State, 695 So.2d 1229, 1235 (Fla.1997)). “The intention of the killer to inflict pain on the victim is not a necessary element of the aggravator.” Guzman v. State, 721 So.2d 1155, 1160 (Fla.1998). Rather, “the HAC aggravator may be applied to torturous murders where the killer was utterly indifferent to the suffering of another.” Id. And “the victim’s mental state may be evaluated for purposes of such determination in accordance with a common-sense inference from the circumstances.” Swafford v. State, 533 So.2d 270, 277 (Fla.1988).
Here, there was evidence supporting the HAC aggravator for the murder of Anthony Blunt. Blunt was attending a party when Hall stormed in and demanded money with the threat that he was going to start firing his AK-47. After Hall made good on his threat and Blunt was shot multiple times, Blunt was left groaning, breathing heavily, sweating, begging for help, and indicating that he was in severe pain. Blunt was aware that he had been shot and remained conscious for as long as it took emergency medical responders to arrive at the scene and throughout much of the time that paramedics were providing aid. Blunt was also conscious and nearby when a fellow partygoer was shot to death in the face for mentioning additional money that the intruders could not locate. A medical examiner testified that none of Blunt’s wounds would have rendered him immediately unconscious and each would have caused serious bleeding and pain. Emergency medical responders classified Blunt as being “critical” and “in serious distress” because of his wounds. Blunt eventually went into cardiac arrest and had to be intubated, monitored, and given CPR. While he was bleeding to death, Blunt repeatedly said, “I don’t want to die, I don’t want to die.”
With these facts presented, the jury instruction on this aggravator was not error. Additionally, we conclude that the trial court did not err in finding the HAC ag-gravator because it was supported by the above competent substantial evidence.[5] See McGirth v. State, 48 So.3d 777, 795-96 (Fla.2010) (holding that the HAC aggravator was supported by competent substantial evidence when the victim witnessed her daughter bound and taken from her home, and when the gunshot victim remained conscious, asked the defendant for help, and experienced pain, difficulty breathing, and anxiety while suffering for fifteen to thirty minutes before dying), cert. denied, — U.S. -, 131 S.Ct. 2100, 179 L.Ed.2d 898 (2011).

B. Proportionality

Hall also claims that his death sentence is disproportionate. However, this claim is without merit.
Proportionality review “is not a comparison between the number of aggra *673 vating and mitigating circumstances.” Crook v. State, 908 So.2d 350, 356 (Fla.2005) (quoting Urbin v. State, 714 So.2d 411, 416 (Fla.1998)). Instead, the Court considers the totality of the circumstances to determine if death is warranted in comparison to other cases where the death sentence has been upheld. Davis v. State, 859 So.2d 465, 480 (Fla.2003).
The circumstances- of this case reveal murder by shooting, committed during the course of a robbery. Evidence established that the shooting occurred in a room containing at least thirteen people, that at least twenty shots were fired, that four people suffered multiple gunshot wounds, and that two attendees were fatally wounded. And evidence was presented that Blunt was killed in a manner involving unnecessary agony and that Hall was indifferent to Blunt’s suffering. Hall was also subject to the prior violent felony aggravator based for his contemporaneous convictions for armed burglary, armed robbery, two counts of attempted felony murder, and first-degree murder. Of these four aggravators, the trial court gave “great weight” Hall’s prior violent felony convictions, “great weight” to the committed for pecuniary gain aggravator, “great weight” to the great risk of death to many people aggravator, and “great weight” to the HAC aggravator.
Evidence was presented indicating that Hall was of low intelligence. The trial court gave “some weight” to the statutory mental mitigator of Hall’s impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, “some weight” to the nonstatutory mitigators of family history of criminal behavior, family history of substance abuse, poor role models, mental health issues, and growing up in a dangerous neighborhood that reinforced drug use. The trial court gave “minimal weight” to the nonstatutory mitigators of substance abuse issues, appropriate courtroom behavior, different living arrangements as a child, and possible abuse as a child.
Considering those circumstances, the aggravating and mitigating factors weighed by the trial court, and other cases with similar facts, we conclude that Hall’s death sentence is proportionate. See, e.g., McLean v. State, 29 So.3d 1045 (Fla.2010) (in a robbery with multiple gunshot victims, death sentence proportionate with prior violent felony • aggravator and committed during a robbery aggravator, both statutory mental health mitigators, and nonstatutory mitigators of substance abuse, family problems, mild brain injury, and miscellaneous factors) cert. denied, - U.S. -, 131 S.Ct. 153, 178 L.Ed.2d 92 (2010); Hayward v. State, 24 So.3d 17 (Fla.2009) (death sentence proportionate with prior violent felony aggra-vator and merged committed during a robbery/committed for pecuniary gain ag-gravator and nonstatutory mitigators including academic problems, an absent father, some capacity for rehabilitation, and financial stress at the time of the crime); Singleton v. State, 783 So.2d 970 (Fla.2001) (death sentence proportionate with prior violent felony aggravator and HAC aggravator, both statutory mental miti-gators as well as age, and various nonstat-utory mitigators (substance abuse, impaired capacity, good behavior as prisoner and soldier, intent to kill formed during argument, mental issues)); Shellito v. State, 701 So.2d 837 (Fla.1997) (death sentence proportionate with prior violent felony aggravator and merged pecuniary gain/commission during a robbery aggra-vator and several nonstatutory mitigating circumstances (family issues, mental issues, and a troubled childhood)); Henyard v. State, 689 So.2d 239 (Fla.1996) (death sentence proportionate with the prior vio *674 lent felony aggravator, pecuniary gain ag-gravator, HAC aggravator, and committed during the course of a felony aggravator, statutory mitigators of young age, extreme emotional disturbance, and impaired capacity to conform conduct to the requirements of the law, and nonstatutory mitigators including low intelligence and emotional immaturity, impoverished upbringing, dysfunctional family, ability to adjust to prison life, and disparate treatment of codefendant); Pope v. State, 679 So.2d 710 (Fla.1996) (death sentence proportionate with prior violent felony aggra-vator and pecuniary gain aggravator, statutory mitigators of mental or emotional disturbance at the time of the crime and impaired capacity to appreciate the criminality of conduct or to conform conduct to the requirements of the law, and nonstatu-tory mitigators including that defendant was intoxicated, was under the influence of mental or emotional disturbance, and acted after a disagreement with his girlfriend).
III. SUFFICIENCY
Hall does not challenge the sufficiency of the evidence, but in death sentence appeals, this Court independently reviews the record to confirm that the jury’s verdict is supported by competent substantial evidence. See Delgado v. State, 948 So.2d 681, 689-90 (Fla.2006).
The following competent substantial evidence presented at trial is sufficient to support Hall’s conviction: (1) Hall’s former girlfriend, Angel, testified that Hall told her he intended to rob the men at the party and that Hall followed her and the other women to the house; (2) Angel testified that Hall was the first gunman to enter the house, that he was carrying an AK-47, and that he was threatening to shoot the victims; (3) another eyewitness, Nikita Jackson, testified that Hall was the gunman demanding money and jewelry, that Hall was carrying a large gun, and that Hall was the first to fire his weapon; (4) Willie Shelton testified that the man with the AK-47 was the one giving the orders to the other robbers; (5) Angel and Nikita testified that, immediately after the robbery, they met Hall at a gas station, that Hall was carrying both a gun and property stolen during the robbery, and that Hall complained that he had not received enough money in the robbery; (6) cell phone records established that Hall was in communication with Dante, Pig, Shoo-Shoo, and Angel on the night of the murders and that his cell phone was in the area of the crime scene during the time of the crimes; (7) a fellow inmate testified that Hall admitted that he orchestrated the robbery and described the details of the robbery, including stating that he had been armed with an AK-47 and had shot a man.
IV. CONCLUSION
For the foregoing reasons, we affirm Hall’s convictions and his sentence of death.
It is so ordered.
CANADY, C.J., and LEWIS, QUINCE, POLSTON, and PERRY, JJ, concur.
PARIENTE, J., concurs in part and dissents in part with an opinion, in which LABARGA, J., concurs.

. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

. The State had not sought the heinous, atrocious, or cruel aggravator in regard to the murder of Keson Evans.

. Spencer v. State, 691 So.2d 1062 (Fla. 1996).

. Hall also claims that Florida’s capital sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). However, his claim is without merit because the prior violent felony aggravator is present in this case. See Bryant v. State, 901 So.2d 810, 823 (Fla.2005).

. Contrary to Hall’s argument, this case is not similar to Teffeteller v. State, 439 So.2d 840 (Fla.1983). There are additional circumstances here that were not present in Teffetel-ler, including the fact that Blunt was conscious while others were shot nearby. As the trial court in this case stated when finding HAC, “It is not unreasonable to conclude that [Blunt] knew he was dying. He likewise was aware that others were shot, thus heightening his terror of the potential result.”