PER CURIAM.
Cheryl Dunlap disappeared from the Leon Sinks Geological Area in Leon County, Florida, on December 1, 2007. Her body was discovered in the Apalachicola National Forest on December 15, 2007. Gary Hilton, who had been seen in the area during that time, and who was convicted in Georgia for a similar crime, was charged with her kidnapping and murder. After trial, the jury convicted Hilton. After hearing penalty phase evidence, the jury unanimously recommended the death penalty. The court followed the jury’s recommendation and sentenced Hilton to death, finding six aggravating factors, one statutory mitigating factor, and eight non-statutory mitigating factors. This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the following reasons, we affirm Hilton’s convictions and sentence.
FACTS
On February 28, 2008, a Leon County grand jury indicted Gary Michael Hilton for the first-degree murder of Cheryl Dunlap between December 1 and December 15, 2007, kidnapping, grand theft of a motor vehicle, and grand theft of currency. Hilton pleaded not guilty on March 14, 2008. Hilton proceeded to a jury trial commencing on February 2, 2011.
Cheryl Dunlap, 46, was last seen alive on December 1, 2007. That morning, Dunlap called a friend, Kiona Hill, and made arrangements to have dinner with her that evening. That afternoon, Dunlap went to Leon Sinks to read, where she was seen by Michael and Vikki Shirley at approximately 1:30 p.m. The Shirleys described that Dunlap was wearing jeans and a sweater and , carrying a hardback book. Dunlap did not arrive for dinner that evening and was missed at church the following morning by Tanya Land. Land went to Dunlap’s residence and found her dog, but noticed that her car was missing so she called the police. Steven Ganey of the Wakulla County Sheriffs Office took the missing person report on December 3, 2007.
Dunlap’s car, a white Toyota Camry, was found on December 3, 2007, on the side of Crawfordville Highway parked near the woods. The car had deliberate tire punctures in the sidewall that was later identified as a bayonet piercing. On December 1, the car had received a disabled vehicle ticket from Florida Highway Patrol *747 Trooper Brian Speigner. Ganey testified that it appeared that someone had driven into the woods with all four tires intact and punctured the tire after the car had been parked. Dunlap’s purse was recovered in her car, but no money was found.
Dunlap’s Ameris Bank account records revealed that Dunlap cáshed a check with a drive-through teller at 11:17 a.m. on December 1. The records further revealed that three cash withdrawals were made at the ATM at Hancock Bank on West Tennessee Street on December 2, 3, and 4, 2007, totaling $700. In addition, two attempted withdrawals were declined because they exceeded the daily limit. The video from the security camera at the bank showed that the person making the transactions was wearing a blue and white patterned, long-sleeved shirt, glasses, a hat, and a make-shift mask made from tape.
Dunlap’s body was discovered on December 15 by Ronnie Rentz while he was hunting in the Apalachicola National Forest. Dunlap’s body was near a forest road and had been covered with some brush and limbs. Additionally, her head and hands had been removed. Dunlap’s body was identified using a sample of thigh muscle. Dr. Anthony Clarke, an associate medical examiner, performed the autopsy. Dr. Clarke opined that Dunlap’s head and hands had been removed by an instrument with a sharp blade and that the dismemberment occurred postmortem. The cause of death was not able to be determined, but Dr. Clarke opined that it was likely to have been a violent homicide. Additionally, Dr. Clarke noted that there was a significant pre-mortem bruise located on Dunlap’s middle to lower back and that the bruise was not consistent with a normal fall injury. Dr. Clarke estimated that Dunlap’s body could have been in the woods for seven to fifteen days. Dr. Clarke testified that his best estimate was that Dunlap died between December 5 and December 8, 2007.
On January 9, 2008, investigators found what they believed to be the remains of Dunlap’s head and hands in a fire pit at Joe Thomas campsite — approximately seven miles from where her body had been found. The bone fragments were charred. Because of the burn damage, no DNA was recoverable from the fragments. Dr. Anthony Falsetti, a forensic anthropologist, opined that there were two hands represented, that the bones were from an adult, and that the bones were from a person with small hands.
Several witnesses testified that they saw or encountered Gary Michael Hilton during the time period surrounding Dunlap’s disappearance. In late November 2007, George Ferguson encountered Hilton on LL Wallace Road. Hilton asked Ferguson for a jump start because his van, a white Chevrolet Astro, would not crank. Ferguson testified that it did not appear to him that Hilton actually needed the assistance. Ethan Davis provided similar testimony, that sometime in late November 2007, Hilton stopped him and asked for help starting his vehicle. Davis declined. Shawn Matthews also encountered Hilton in late November near his LL Wallace Road camp. Hilton appeared to be familiar with the area and told Matthews about a nearby sinkhole. On December 1, 2007, Celeste Hutchins saw Hilton on Crawfordville Highway, not far from Leon Sinks. Hutchins testified that Hilton was rummaging through a white Camry on the side of the road. On December 10, 2007, Loretta Mayfield spoke to Hilton at a convenience store on Crawfordville Highway. Mayfield testified that Hilton was wearing a blue and white patterned shirt. Hilton was also wearing something on his left side that looked like a large knife holder. Mayfield testified that the shirt she saw *748 Hilton wearing looked like the one in the ATM security video. On December 11, 2007, Stephen Prosser saw Hilton in the Apalachicola National Forest. On December 12, 2007, Michael Travis saw Hilton in the forest near the Bloxham cutoff and then saw him again on December 14. On December 18, 2007, Teresa Johnson saw Hilton in Bristol, Florida, where Hilton told her that she looked like Dunlap and that it was “too bad” about that girl getting murdered.
Sometime between December 18, 2007, and January 1, 2008, Hilton made his way to Georgia where he kidnapped and murdered Meredith Emerson. Hilton took Emerson from Blood Mountain and held her for four days before murdering her. He cooperated with law enforcement in exchange for a life sentence. Hilton was arrested in Georgia after Stephen Shaw saw Hilton walk to the back of a convenience store in the direction of the store’s dumpsters and called law enforcement. Law enforcement officers recovered items Hilton was seen discarding in a dumpster at the convenience store. From the dumpster, law enforcement recovered a U.S. Forestry citation for unauthorized camping, a knife and sheath, Hi-Tec boots, some chain, a padlock, gloves, a jacket, a folding police baton, and a blue backpack. Hilton gave Georgia officials information on where to find his bayonet on a hiking trail on Blood Mountain in North Georgia. Later, Jeff Foggy, an FDLE tool mark expert, matched the bayonet to the puncture marks in Dunlap’s tire. Georgia law enforcement also gathered items from Hilton’s van. Items recovered from the van included clothing, jackets, gloves, camping equipment, duffel bags, two sleeping bags, Hi-Tec boots, a camera, tobacco rolling papers, Hilton’s Georgia driver’s license, tape, paper towels, maps, two BB pistols, a book purchased at a Tallahassee book store, and dog food.
On February 12, 2008, Sergeant David Graham and Detective Dawn Dennis with the Leon County Sheriffs Office executed a search warrant on Hilton while he was in custody in Georgia. Hilton’s DNA was collected and the entire execution of the warrant was recorded. Portions of the recording were played for the jury.
On June 6, 2008, Sergeant Graham and two other officers drove Hilton from Georgia to Florida. Although Hilton was not questioned, he spoke for nearly the entire five-hour drive, which was recorded. The State also played portions of this recording at trial. Hilton stated:
I’m not all bad. I mean, you got to understand, I mean, I’m sure you can see. I mean, I’m a [expletive] genius, man. I’m not a — I’m not all bad. I just, you know, lost my mind for a little bit. Lost a grip on myself, man. What can I tell you? FBI and everybody else is trying to scratch their head, hey, guys don’t get started doing my shit at 61 years old. It just don’t happen, you know. Like there’s a retired FBI (indecipherable) named Cliff Van, Clifford Van Zandt, that keeps getting himself in the news, talking about me. And he said, this guy didn’t just fall off the turnip truck, he said. You know, in other words, he’s been doing this. But like I told you before, you know, when I saw you before, I said, remember, I said I’d give you one for free. Nothing before September, okay? I mean, I’m not joking, okay? I just, I got old and sick and couldn’t make a living and just lost, flat lost my [expletive] mind for a while, man. I couldn’t get a grip on it.
Additionally, Hilton made statements to a fellow inmate at the Leon County Jail that were overheard by Correctional Officer Caleb Wynn. Specifically, Hilton told inmate Summers that he could answer all *749 the State Attorney’s questions if he would give him a life sentence, that he would reveal where the head was located, that his bayonet was used on Dunlap’s tire, that he would explain how he “pulled it off’ on a busy highway, that he spent a few hours or a few days with Dunlap, and that he felt no regret other than getting caught.
The penalty phase began on February 17, 2011, during which the state called Clay Bridges of the Georgia Bureau of Investigation. Agent Bridges testified about Hilton’s prior felony conviction — the murder of Emerson in Georgia to which Hilton pleaded guilty. The State played Hilton’s taped conversation with law enforcement where he described kidnapping Emerson, holding her captive, and stripping her body naked to remove DNA and fiber evidence. He also stated that “you either kill them or you get caught.”
Hilton presented four expert witnesses who testified regarding his psychological condition: Dr. Joseph Wu, a psychiatrist and clinical director of the Brain Imaging Center at the University of California, Irvine; Dr. Charles Golden, a clinical neu-ropsychologist performing neuropsychological testing and examinations; Dr. Abbey Strauss, a psychiatrist with special expertise in psychopharmacology; and Dr. William Morton, a board certified psychiatric pharmacist and professor; and nine lay witnesses. The State then called Dr. Greg Prichard in rebuttal.
On February 21, 2011, the jury recommended unanimously that Gary Hilton be sentenced to death for the murder of Cheryl Dunlap.
The trial court held the Spencer[1] hearing on April 7, 2011. The State presented three victim impact witnesses: (1) Ms. Emma Blount, the victim’s aunt; (2) Laura Walker, the victim’s best friend; and (3) Gloria Tucker, the victim’s cousin. Hilton presented no witnesses.
The trial court found that the State had proven six aggravators beyond a reasonable doubt. Assigning weight to each ag-gravator, the trial court found: (1) the defendant was previously convicted of a violent felony (great weight); (2) the murder was committed in the course of a kidnapping (great weight); (3) the murder was committed to avoid arrest (moderate weight); (4) the murder was committed for pecuniary gain (some weight); (5) the murder was especially heinous, atrocious or cruel (HAC) (great weight); and (6) the murder was cold, calculated, and premeditated (CCP) (great weight).
The court also considered and weighed each mitigating circumstance proposed by Hilton and found one statutory mental mitigating factor — at the time of the murder Hilton was under extreme emotional distress (some weight). Under the catch-all provision, the trial court considered ten mitigating factors, finding that Hilton established eight of them and rejecting two. The court found: (1) Hilton grew up in an abusive household (some weight); (2) Hilton abused drugs, specifically Ritalin (some weight); (3) Hilton was deprived of a relationship with his biological father (moderate weight); (4) Hilton is already serving a life sentence so society is protected (some weight); (5) Hilton served his country in the U.S. military (very little weight); (6) Hilton suffered maternal deprivation and lack of bonding between mother and child (some weight); (7) Hilton was removed from his home and put into foster care when he was a child (some weight); (8) Hilton grew up in a financially poor family (not proven); (9) Hilton suffered a traumatic brain injury as a child *750 (some weight); and (10) Hilton suffers from severe mental defects (not proven).
On April 21, 2011, the trial court followed the jury’s unanimous recommendation and sentenced Hilton to death. The court found beyond a reasonable doubt that the aggravators outweighed the miti-gators.
Collateral Crime Evidence
Hilton argues that his statements to law enforcement during his transport from Georgia to Florida should not have been introduced at trial because they constitute inadmissible Williams[2] rule evidence because the statements were only relevant to show his propensity to commit crime. The State argues that the trial judge did not commit error in admitting the statements because Hilton did not state that he had committed other murders or crimes before he kidnapped Cheryl Dunlap. The State argues further that even if the statements constitute collateral crime evidence, they were still admissible to prove premeditation. Because the statements did not constitute similar fact or collateral crime evidence and were otherwise relevant and admissible to establish premeditation, we find that the statements were properly admitted.
Collateral crime evidence “is inadmissible when the evidence is relevant solely to prove bad character or propensity.” § 90.404(2)(a), Fla. Stat. (2008). We explained in McGirth v. State, 48 So.3d 777, 786-87 (Fla.2010), cert. denied, - U.S. -, 131 S.Ct. 2100, 179 L.Ed.2d 898 (2011), that:
[a]n appellate court will not disturb a trial court’s determination that evidence is relevant and admissible absent an abuse of discretion. Relevant evidence is generally admissible unless precluded by a specific rule of exclusion. There are two categories under which evidence of uncharged crimes or bad acts will be admissible — similar fact evidence, otherwise known as Williams rule evidence, and dissimilar fact evidence. The requirements and limitations of section 90.404 govern similar fact evidence while the general rule of relevancy set forth in section 90.402 governs dissimilar fact evidence.
Id.; see also McCray v. State, 71 So.3d 848 (Fla.2011) (internal citations omitted) cert. denied, — U.S. -, 132 S.Ct. 1743, 182 L.Ed.2d 536 (2012).
During his transport from Georgia to Florida, Hilton talked practically nonstop for the entire nearly five-hour drive. During this time, Hilton made several statements that were played in front of the jury. At issue here, Hilton stated, “like I told you before, you know, when I saw you before, I said, remember, I said I’d give you one for free. Nothing before September, okay? I mean, I’m not joking, okay?” Hilton also stated repeatedly that he had “lost his mind” for a while. Hilton claims that these statements were evidence of collateral crimes. Hilton’s argument is without merit. The statements played for the jury did not implicate Hilton in a collateral crime, nor did they constitute similar fact evidence. Further, even if the statements constituted Williams rule evidence, they were admissible to demonstrate premeditation and were not introduced solely to demonstrate Hilton’s bad character or propensity. Furthermore, Hilton’s statement to law enforcement was ambiguous and did not directly implicate him in a collateral crime. Hilton’s statement that he began “hunting” in September did not correlate with any known crime at the time of his trial. Nothing in Hilton’s statement implies that Dunlap was *751 not his first victim or implicates Hilton in a collateral crime. We do not find these statements constitute Williams rule evidence. Because Hilton’s statement was relevant to prove premeditation, we find that the trial court did not abuse its discretion in admitting the evidence. See § 90.404(2), Fla. Stat. (2008); see, e.g., Durousseau v. State, 55 So.3d 543 (Fla.2010), cert. denied, — U.S. -, 132 S.Ct. 149, 181 L.Ed.2d 66 (2011).
Dr. Prichard’s Testimony
Hilton argues that the trial court erred in permitting Dr. Gregory Prichard to testify about allegations of Hilton’s past criminal conduct during the penalty phase and that such testimony constituted improper nonstatutory aggravating circumstances. The State argues that Dr. Prich-ard was called as a proper rebuttal witness to dispute Hilton’s claim that he had done nothing wrong prior to this crime and that the change in his character was created by Ritalin. Because Hilton’s expert testimony opened the door for Dr. Prichard’s testimony, we find that the trial court properly admitted the testimony.
In considering the admission of evidence during the penalty phase of a trial, in Hildwin v. State, 531 So.2d 124, 127 (Fla.1988), we noted:
it must be remembered that there is a different standard for judging the admissibility and relevance of evidence in the penalty phase of a capital case, where the focus is substantially directed toward the defendant’s character. See § 921.141(1), Fla. Stat. (1987). In Elledge v. State, 346 So.2d 998, 1001 (Fla.1977), we pointed out that “the purpose of considering aggravating and mitigating circumstances is to engage in a character analysis of the defendant to ascertain whether the ultimate penalty is called for in his or her particular case.”
Thus, “evidence that would not be admissible during the guilt phase could properly be considered in the penalty phase.”
Perry v. State, 801 So.2d 78, 89-90 (Fla.2001).
In Perry, we found that the State’s “anticipatory rebuttal” was improper and that nothing in the record supported the State’s assertion that the defendant “opened the door” to be questioned about specific acts of past violence. Id. at 90 (citing Hildwin, 531 So.2d at 128). Here, however, Hilton’s penalty phase defense relied heavily on the assertion that Hilton was a law-abiding citizen prior to his exposure to Ritalin. Dr. Prichard’s testimony was provided in rebuttal to that assertion. We therefore find that the testimony in this case when “[vjiewed in context, ... was offered in rebuttal to the defense, not as a nonstatu-tory aggravator.” Zack v. State, 911 So.2d 1190, 1208 (Fla.2005). Accordingly, we deny relief on this claim.
Witness Sequestration
Hilton argues that the trial court erred in permitting Dr. Prichard to stay in the courtroom, despite the sequestration rule. Because we find that the trial court did not err in excluding Dr. Prichard from the sequestration rule, we deny relief on this claim.
We have previously provided that reason for the rule of witness sequestration is to avoid coloring a witness’s testimony by that heard from other witnesses, but that the rule is not an absolute that must be invoked at the mere request of counsel. See Randolph v. State, 463 So.2d 186,191 (Fla.1984) (citing Spencer v. State, 133 So.2d 729 (Fla.1961)). Section 90.616(2)(c), Florida Statutes (1997), allows an exception when a witness’s presence is shown by the party’s attorney to be essential to the presentation of the party’s cause, and the trial court has wide discre *752 tion in making that determination. See Knight v. State, 746 So.2d 423, 430 (Fla.1998).
Here, Dr. Prichard was permitted to stay in the courtroom upon the State’s request. Because the State was late filing its notice of intent to seek the death penalty, Dr. Prichard was prevented from examining Hilton. The State requested that he be excluded from the sequestration rule to give Dr. Prichard a chance to provide meaningful assistance to the State. He testified in rebuttal to the defense expert witnesses and did not serve as a fact witness. During cross-examination, Dr. Prichard stated that he “sat through the entire penalty phase ... and handed notes to Mr. Meggs.” Accordingly, we find that Dr. Prichard’s presence was essential to the presentation of the State’s cause and that the trial court did not abuse its discretion permitting Dr. Prichard to remain in the courtroom.
Aggravators
Hilton argues that the evidence was insufficient to establish the HAC and CCP aggravating circumstances and that the trial court erred in finding these circumstances applied in Hilton’s case. The State argues that the trial court properly relied on the circumstances surrounding a collateral murder. Because we find competent, substantial evidence in the record to support the trial court’s findings, we find no error.
“In reviewing an aggravating factor challenged on appeal, this Court’s task ‘is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance, and, if so, whether competent substantial evidence supports its finding.’ ” Douglas v. State, 878 So.2d 1246, 1260-61 (Fla.2004) (quoting Willacy v. State, 696 So.2d 693, 695 (Fla.1997)); see also Heyne v. State, 88 So.3d 113, 122 (Fla.), cert. denied, — U.S. -, 133 S.Ct. 574, 184 L.Ed.2d 377 (2012). In deciding whether a lower court erred in its finding of an ag-gravator, we do not reweigh the evidence to determine whether an aggravator was proven beyond a reasonable doubt but instead “review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.” Franklin v. State, 965 So.2d 79, 98 (Fla.2007) (quoting Willacy, 696 So.2d at 695).
HAC
This Court has explained the meaning of the HAC aggravator as follows:
It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies— the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
State v. Dixon, 283 So.2d 1, 9 (Fla.1973); see also Guzman v. State, 721 So.2d 1155, 1159 (Fla.1998) (“The HAC aggravator applies only in torturous murders — those that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another.”). This Court has also stated that “[ujnlike the cold, calculated and premeditated aggravator, which pertains specifically to the state of mind, intent and motivation of the defendant, the *753 HAC aggravator focuses on the means and manner in which death is inflicted and the immediate circumstances surrounding the death.” Brown, v. State, 721 So.2d 274, 277 (Fla.1998) (citing Stano v. State, 460 So.2d 890, 893 (Fla.1984)). Furthermore, we have held that “[i]n determining whether the HAC factor was present, the focus should be upon the victim’s perceptions of the circumstances as opposed to those of the perpetrator.” Lynch v. State, 841 So.2d 362, 369 (Fla.2003); see also Heyne, 88 So.3d at 122; McGirth, 48 So.3d at 794. The victim’s mental state may be evaluated in accordance with common-sense inferences from the circumstances. Swafford v. State, 533 So.2d 270, 277 (Fla.1988). “[F]ear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel.” James v. State, 695 So.2d 1229, 1235 (Fla.1997); see also Swafford, 533 So.2d at 277; Hall v. State, 87 So.3d 667, 671-72 (Fla.2012). Additionally, we have held that the actions of the defendant preceding the actual killing are also relevant. Gore v. State, 706 So.2d 1328, 1335 (Fla.1997).
Here, the record demonstrates competent, substantial evidence that Dunlap was held anywhere from 2 days to a week prior to her murder, and that she was injured enough during that time to leave traces of her blood on several of Hilton’s items. The trial court’s inferences that the victim was likely terrified, suffering from emotional strain, or suffering during the time leading up to her murder are supported by our review of the record. Accordingly, we find that there is competent, substantial evidence contained in the record to support the trial court’s finding of HAC.
CCP
As it relates to the finding of CCP, we have stated:
To establish the CCP aggravator, the State must prove beyond a reasonable doubt that (1) the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); (2) the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); (3) the defendant exhibited heightened premeditation (premeditated); and (4) the murder was committed with no pretext of legal or moral justification.
McWatters, 36 So.3d at 640-41. “The CCP aggravator pertains specifically to the state of mind, intent, and motivation of the defendant.” Wright v. State, 19 So.3d 277, 298 (Fla.2009) (citing Brown v. State, 721 So.2d 274, 277 (Fla.1998)). The trial court’s determination of whether CCP is present in a case is based upon the totality of the circumstances. Hudson v. State, 992 So.2d 96, 115 (Fla.2008). CCP can be proved by circumstantial evidence. Pearce v. State, 880 So.2d 561, 576-77 (Fla.2004). CCP can be indicated by the circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course. Swafford, 533 So.2d at 277. It is the State’s burden to prove beyond a reasonable doubt that the murder was the product of cool and calm reflection and not an act of emotional frenzy or panic, or a fit of rage. Walker v. State, 957 So.2d 560, 581 (Fla.2007). “ ‘[T]he facts supporting CCP must focus on the manner in which the crime was executed, e.g., advance procurement of weapon, lack of provocation, killing carried out as a matter of course.’ ” Id. (quoting Lynch, 841 So.2d at 372). “ ‘Competent substantial evidence is tantamount to legally sufficient evidence, and [this Court] assesses] the record evidence for its sufficiency only, not its weight.’” McCoy v. State, 853 So.2d 396, 407 (Fla. *754 2003) (quoting Almeida v. State, 748 So.2d 922, 932 (Fla.1999)).
This Court has also found the heightened premeditation required to support CCP where a defendant has a lengthy period of reflection and the opportunity to abandon the plan but, instead, commits the murder. Alston v. State, 723 So.2d 148, 162 (Fla.1998). We explained in Alston that where the defendant had ample opportunity to release the victim but instead, after substantial reflection, “acted out the plan [he] had conceived during the extended period in which [the] events occurred,” heightened premeditation was proven. Id. (quoting Jackson v. State, 704 So.2d 500, 505 (Fla.1997)) (citation omitted); see also Looney v. State, 803 So.2d 656, 679 (Fla.2001).
The trial court’s finding of CCP in this case is supported by competent, substantial evidence. Hilton’s statements to law enforcement demonstrate that he killed as a matter of course. He describes his own actions as “hunting.” Although the manner of killing was not able to be established, the method of disposal of the victim’s body was calculated and carried out after a period of needed reflection. Hilton’s statements on the self-made video and to a fellow inmate describe being with the victim for a long enough time for careful reflection. Accordingly, we And that the trial court did not err in finding this aggravating factor.
Mitigation
Hilton argues that that trial court improperly rejected the lack of capacity mitigating factor and failed to provide reasons why there is substantial, competent evidence in the record to support the rejection of the mitigating circumstance. The State argues that the trial court properly weighed the experts’ testimonies and found the State’s expert’s opinion more credible.
In rejecting this mitigating factor, the trial court stated, “[t]he Court finds that Dr. Prichard’s testimony was more credible and more consistent with the other evidence in the case as to this point. The Court finds that this factor in mitigation was not proven.” A trial court may reject a defendant’s claim that a mitigating circumstance has been proven as long as the record contains competent substantial evidence to support the trial court’s rejection of the mitigation. See Spencer, 645 So.2d at 385. Even expert testimony may be rejected if it cannot be reconciled with the other evidence in the case. See Coday v. State, 946 So.2d 988, 1005 (Fla.2006). Here, the testimony was not uncontrovert-ed and, “[i]t is apparent from the ... trial judge’s sentencing order that he considered the expert testimony presented in support of these factors but found this testimony unpersuasive.” Roberts v. State, 510 So.2d 885, 894 (Fla.1987). Accordingly, we deny relief on this claim.
Ring Claim
Hilton argues that this Court should reexamine its holdings in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002). Because Hilton was convicted of murder that occurred in connection with a kidnapping and because Hilton had previously been convicted of a prior violent felony, we find his request without merit. We have repeatedly rejected this argument when either aggravating factor is present. See McMillian v. State, 94 So.3d 572 (Fla. 2012), cert. denied, - U.S. -, 133 S.Ct. 1260, 185 L.Ed.2d 203 (2013); Heyne v. State, 88 So.3d 113, 120 n. 2 (Fla.2012); Kopsho v. State, 84 So.3d 204, 220 (Fla.), cert. denied — U.S. -, 133 S.Ct. 190, *755 184 L.Ed.2d 97 (2012); Hodges v. State, 55 So.3d 515, 540 (Fla.2010), cert. denied, — U.S. -, 132 S.Ct. 164, 181 L.Ed.2d 77 (2011).
Sufficiency
Hilton does not challenge the sufficiency of the evidence to support his convictions. However, this Court independently assesses the sufficiency of the evidence to determine whether it is legally sufficient. See Crain v. State, 894 So.2d 59, 72 (Fla.2004) (“... in capital cases, this Court independently assesses the sufficiency of the evidence to determine if it is legally sufficient.”). Based on our review of the record, we find that there is competent substantial evidence to sustain the convictions in this case.
Viewing the evidence in the light most favorable to the State, there is competent, substantial evidence to support Hilton’s convictions. See Bradley v. State, 787 So.2d 732, 738 (Fla.2001) (“In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.”). Specifically, the evidence presented at trial demonstrated that Cheryl Dunlap disappeared on December 1, 2007, and that on December 15, her decomposing body was found beheaded and with her hands removed. Dunlap had been last seen on December 1, 2007, at Leon Sinks National Park. Her car was located abandoned on Crawford-ville Highway on December 3 with a tire that had been punctured by an item later identified as Hilton’s bayonet. On December 1, witnesses saw a man rummaging through Dunlap’s car and later identified that man as Gary Hilton. Witnesses spoke with Hilton in surrounding areas during the time Dunlap was reported missing. Witnesses identified the clothing Hilton was wearing during that time period. On December 2, 3, and 4, a man matching Hilton’s build and wearing clothing similar to that described by witnesses used Dunlap’s ATM card and PIN at Hancock Bank on Tennessee Street to remove a total of $700 from her bank account. In a self-made video retrieved from a camera found in Hilton’s possession, Hilton is shown on December 3, 2007, talking to himself or his dog, describing hiding unknown items and killing “those b*tches.” Charred human bones, including a skull and hand bones, were found in a fire pit near a campsite where Hilton was seen by Shawn Matthews. In addition, this campsite also contained cigarette butts that contained Hilton’s DNA. Dunlap’s DNA was found on articles recovered from Hilton’s van, including two sleeping bags, Hilton’s duffel bag, some pants and on the Hi-Tec boots Hilton was seen discarding. Hilton was overheard by law enforcement telling a fellow inmate that he would tell them where the head was if they would give him a life sentence. On the drive from Georgia to Florida, Hilton told law enforcement that he had lost his mind, but hadn’t done anything before September. Based on this, we find the evidence sufficient to support the convictions in this case.
Proportionality
Although not raised by Hilton, we have an independent duty to review the proportionality of a death sentence. See McMillian, 94 So.3d at 581 (citing Bolin v. State, 869 So.2d 1196, 1204 (Fla.2004)); Hampton v. State, 103 So.3d 98 (Fla.2012), petition for cert. filed, No. 12-8923 (U.S. Feb. 20, 2013). A review of the evidence demonstrates that the proportionality of Hilton’s sentence of death is proportionate.
Here, the jury’s recommendation was unanimous. The trial court weighed the six aggravators proven by the State against the mitigation proven by Hilton *756 and concluded that “the aggravating circumstances outweigh the mitigating circumstances in this case.” The aggravating circumstances found are supported by competent, substantial evidence and the record “fails to reveal any indication that the trial court abused its discretion in assigning little weight to the mitigation that was established.” Hampton, 103 So.3d at 121. We find that the imposition of the death sentence in this case is proportionate when compared to other death sentences that this Court has upheld. See, e.g., Hildivin v. State, 727 So.2d 193 (Fla.1998) (four aggravators: HAC, prior violent felony, pecuniary gain, and under sentence of imprisonment; two statutory miti-gators; and five nonstatutory mitigators); Johnston v. State, 841 So.2d 349 (Fla.2002) (prior violent felony, kidnapping, pecuniary gain, and HAC versus one statutory miti-gator and twenty-six nonstatutory miti-gators); Suggs v. State, 923 So.2d 419, 440 (Fla.2005) (sentence to death proportionate when the trial court found seven aggravating factors and three mitigating factors, including one statutory mental mitigator and this Court noted that the murder “particularly heinous and premeditated”); Owen v. State, 862 So.2d 687 (Fla.2003) (finding death sentence proportionate for 23 year old defendant, despite the presence of three statutory mitigators, including both mental mitigators and sixteen other mitigators where there was evidence of multiple stab wounds and the presence of multiple aggravators, including HAC, CCP, and a conviction for another murder); Rose v. State, 787 So.2d 786 (Fla.2001) (finding death sentence proportionate despite the presence of eleven nonstat-utory mitigators where trial judge found four aggravators-murder committed while on probation, prior violent felony, murder committed during a kidnapping, and HAC).
Conclusion
For the foregoing reasons, we affirm Hilton’s convictions and sentence of death. It is so ordered.
POLSTON, C.J., and PARIENTE, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.
LEWIS, J., concurs in result.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. Williams v. State, 110 So.2d 654 (Fla.1959).