# Supreme Court of Florida

_____

No. SC2024-1011
_____

**JAMES TERRY COLLEY, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC2024-1647
_____

**JAMES TERRY COLLEY, JR.,**
Petitioner,

vs.

**SECRETARY, DEPARTMENT OF CORRECTIONS,**
Respondent.

December 30, 2025

PER CURIAM.

James Terry Colley, Jr., appeals an order denying his motion to vacate his convictions and sentences—including two convictions for first-degree murder and two sentences of death—filed under

Florida Rule of Criminal Procedure 3.851 and petitions this Court

for a writ of habeas corpus. We have jurisdiction. *See* art. V,

§ 3(b)(1), (9), Fla. Const. For the reasons expressed below, we

affirm the denial of postconviction relief and deny Colley's habeas

petition.

## I. BACKGROUND

In 2018, Colley was convicted of the first-degree murders of

his estranged wife, Amanda Colley, and Lindy Dobbins (Amanda's

friend); the attempted first-degree murder of Lamar Douberly

(Amanda's boyfriend); the attempted felony murder of Rachel

Hendricks (another friend of Amanda's); burglary of a dwelling with

an assault or battery; burglary of a dwelling; and aggravated

stalking after an injunction. *Colley v. State*, 310 So. 3d 2, 9 (Fla.

2020). He was sentenced to death for each murder. *Id.* at 12. This

Court set forth the facts of Colley's crimes on direct appeal:

> At the time of the murders, Colley was living in his
> sister's house on Garrison Drive in St. Augustine.
> Amanda still lived in the marital home on South Bellagio
> Drive, about fifteen miles away. Although he was dating
> someone else, Colley hoped he would reconcile with
> Amanda. Colley suspected that Amanda was dating, but
> she had refused to admit that to him.
> Around 4 a.m. on August 27, 2015, Colley drove to
> Amanda's house, unaware that Amanda was not there.

Colley searched the empty home and found sex toys and men's polo shirts.  His suspicions confirmed, Colley ransacked the house, smashing television sets and dumping trash on the floor.  Afterward, Colley briefly visited a friend a few houses down the street (to tell the friend what he had discovered), and he eventually returned to his sister's home on Garrison Drive.  Colley also placed multiple phone calls to Amanda, most of which went unanswered.

Amanda returned to her home at about 9 a.m.  She FaceTimed her boyfriend, Lamar Douberly, to show him what Colley had done.  Lamar drove to Amanda's and called the police nonemergency line to make a report.  A public service assistance officer arrived at 9:55 a.m. and observed the damage.  Amanda told the officer she did not want to file any formal charges against Colley until she spoke with her mother and attorney, so the officer left.  Two of Amanda's friends, Lindy Dobbins (the other murder victim) and Rachel Hendricks, arrived minutes later.

Meanwhile, at about the same time that Amanda was returning to her home, Colley arrived at the courthouse for a hearing on an unrelated violation of his domestic violence injunction.  In video footage of the hearing, Colley appeared calm and cooperative.  After a colloquy in which Colley, among other things, denied being under the influence of any intoxicants, the trial judge allowed Colley to plead no contest to the charged violation.

Colley left the courthouse a little before 9:30 a.m. and once again began calling Amanda.  After several calls and voicemails, Amanda finally answered at 9:41 a.m.  She and Colley spoke for roughly fourteen minutes.

Having departed the courthouse, Colley drove to a gas station near his sister's house, went to his sister's home, and then briefly returned to the same gas station, where he bought a small amount of gas and some items from the store.  The evidence at trial supported an inference that Colley retrieved ammunition during his

brief stop at his sister's house. The parties disputed whether he also retrieved guns there, or whether he already had guns in the car he was driving. Regardless, shortly after 10 a.m., Colley started the twenty-minute drive back to Amanda's home.

On his way to Amanda's, Colley had a phone conversation with his father. A dog walker who was near Colley's father at the time overheard the call. She testified that she heard Colley's father pleading, "Please, please son, come back and get your truck. Everybody knows what you've been through." To which the person on the other end of the call responded, "I just can't f***ing take this anymore."

Instead of going directly to Amanda's home, Colley drove to an adjacent street and parked his car at an unoccupied house. From there, he crossed a berm and walked along a trail that ran parallel to Amanda's fenced-in backyard. He was armed with two handguns, a 9mm and a .45 caliber.

Colley approached the back of Amanda's house and began shooting from the outside. Amanda, Lamar, Lindy, and Rachel were inside. Hearing the sound of gunshots and the shattering back-door glass, Lamar shouted for everyone to run. Lamar himself ran out of the house through the garage. Fatefully, the women all ran to the home's master bedroom area. Amanda hid in the bathroom. Lindy and Rachel barricaded themselves in the closet. At 10:36 a.m., Amanda and Lindy separately called 911 from their cellphones.

Shouting "where is he, where is he," Colley entered the home through the shattered back glass doors. Colley first found Amanda. He screamed at her and demanded to know where "he" was. Amanda said she did not know and begged Colley to put down his gun. Colley then tried to open the door to the closet, but Rachel held the door shut with her foot. A crying Amanda told Colley that only Rachel and Lindy were in the closet, which prompted Lindy to say, "It's Lindy in here. It's Lindy!"

Colley returned to the bathroom and shot Amanda—but not fatally. He then went back to the closet. Again unable to open the closet door, this time Colley fired a shot through the door. The bullet grazed Rachel's arm, causing her to let go of the door. As Rachel ran out of the closet, Colley entered it and walked to where Lindy was crouched down, hiding behind a chest. Colley shot and killed her.

Amanda was still in the bathroom. So Colley went back there and shot her three more times, until his 9mm was out of bullets. Colley dropped the 9mm and shot Amanda five more times, using the .45.

Colley then left the home, returned to his sister's house on Garrison Drive, abandoned his cell phone, and fled the area. Police officers arrested Colley hours later after a traffic stop in Norton, Virginia.

Colley was charged with the first-degree murder of Amanda Colley; the first-degree murder of Lindy Dobbins; the attempted first-degree murder of Lamar Douberly; the attempted first-degree murder of Rachel Hendricks; burglary with an assault or battery; burglary of a dwelling; and aggravated stalking after an injunction.

*Id.* at 7-8 (alteration in original). The case proceeded to trial, and Colley was convicted on all counts.

At the penalty phase, "[t]he defense focused on Colley's state of mind and claimed that he had been impaired as a result of taking Ambien[1] early in the morning of the murders." *Id.* at 9.

Colley presented the testimony of three expert and eight lay witnesses. The experts focused on Colley's

_____

1. Ambien is a brand name for the drug zolpidem.

- 5 -

alleged impairment. The lay witnesses testified about Colley's character and reputation in the community.

Through Colley's mitigation experts, the jury heard Colley's version of what happened the morning of the murders. Colley told the experts that he had consumed alcohol and cocaine the night before he ransacked Amanda's house. Colley said that he had spoken with Amanda in the predawn hours and offered to pay for the damage he had done, and that Amanda had agreed not to call the police to report the incident. Colley also said that he took one or two Ambien tablets around 5 a.m. and that his father later woke him up to attend the 9:00 a.m. court hearing.

Consistent with the State's evidence, Colley told his experts that he had spoken with Amanda after the court hearing and visited a gas station and his sister's house before driving to Amanda's. But Colley claimed that he had initially approached the back of the house unarmed, only to have a panic attack when he saw a man through the window. That prompted Colley to walk back to his car, retrieve his guns, and ultimately carry out the killings.

Dr. Mark Mills, a forensic psychiatrist, opined that Colley was substantially impaired during the murders because he was experiencing an Ambien side effect called parasomnia. Dr. Mills described parasomnia as a sleep disorder where someone seems to be acting in a rational way, but later has no recollection of his or her actions. Dr. Mills based his opinion largely on the fact that, when he interviewed Colley in October 2017 (approximately two years after the murders), Colley reported having stroboscopic memory—remembering only flashes of what happened the day of the murders.

Dr. Michele Quiroga, a clinical and forensic neuropsychologist, testified that Colley suffers from depression, anxiety, and panic attacks, and that Colley was taking antidepressants in August 2015 (the month of the murders) and self[-]medicating with alcohol. Dr. Quiroga did not give an opinion as to impairment.

Last, Dr. Daniel Buffington, a clinical pharmacologist, gave testimony similar to Dr. Mills's. Dr. Buffington described parasomnia and opined that Colley's snapshot memory from the Ambien and other prescriptions (Colley was taking antidepressants and sleep disorder and pain medications) showed that Colley was substantially impaired at the time of the murders.

As for the lay witnesses, Colley's two sisters testified that he grew up in a normal home with a very close-knit family. They described Colley as having a strong work ethic from a young age and being gainfully employed his entire life. They said that Colley was a great hands-on father to his two kids. They described Colley's volunteer work and mentorships. They explained that Colley had struggled with alcohol abuse for several years. One of the sisters mentioned that as a child Colley had witnessed two incidents of domestic violence between his parents. Two cousins and a brother-in-law attested to Colley being a good father and uncle. A neighbor explained that Colley was involved in the community by coaching his son's football and baseball teams. One of Colley's friends testified that Colley had always been good to his family. And two former coworkers described Colley as a good friend and very family[ ]oriented.

*. . . .*

To refute the claim that Colley was impaired at the time of the murders, the State presented the testimony of two witnesses: Jeffrey Danziger, a forensic psychiatrist, and Judge Charles Tinlin, who presided over Colley's injunction violation hearing the morning of the murders.

Dr. Danziger described parasomnia as an abnormal event or experience during sleep. He explained that any side effects from Ambien are rare and uncommon. He said that people in a parasomnia state sometimes are able to engage in behaviors like sleepwalking or driving a car, but generally these behaviors are poorly coordinated. And, to a layperson, those in such a state would appear confused, dazed, and obviously impaired.

Dr. Danziger explained the basis for his opinion that Colley was neither impaired by substances nor suffering from any parasomnia or sleep disorder at the time of the murders. First, he noted that Colley's behavior was completely normal from the time his medications were prescribed until the day of the murders. Second, he believed Colley's behavior at the courthouse an hour before the murders was completely inconsistent with someone in a parasomnia state; Colley was able to coherently, logically, and appropriately engage in a plea colloquy with Judge Tinlin. Dr. Danziger noted that at the hearing Colley asked the court several questions unique to his case which, to Dr. Danziger, indicated Colley was clearheaded and thinking logically. Finally, Dr. Danziger relied on the fact that, in an interview with a psychologist in November 2015 (approximately ninety[ ]days after the murders), Colley described the murders but did not report any memory loss.

Judge Tinlin testified that he had no concerns that Colley was impaired during the injunction violation hearing and that he would not have accepted a plea if Colley had exhibited any signs of intoxication. The judge recalled that Colley's demeanor was fine. Colley asked questions, gave appropriate responses, and seemed alert and intelligent.

During Judge Tinlin's testimony, the State introduced the video recording of the hearing. The video showed Colley answering various questions in order to enter a plea of no contest. Colley testified (under oath) about his job and education level, and he answered "no" when asked if he was under the influence of any intoxicants. Colley also voluntarily asked several questions throughout the proceeding that were specific to his probation and court fees.

. . . .

The jury unanimously found four aggravating factors proven beyond a reasonable doubt for each of the two murder convictions: (1) Colley was previously convicted of another capital or violent felony (the

- 8 -

contemporaneous murders and attempted murders); (2) Colley committed each murder while engaged in the commission of a burglary; (3) each murder was especially heinous, atrocious, or cruel [HAC]; and (4) Colley committed each murder in a cold, calculated, and premeditated manner, without any pretense of moral or legal justification [CCP]. The jury found one additional aggravating factor applicable to Amanda's murder: (5) Colley committed the murder while subject to a domestic violence injunction and the victim of the murder was the person who obtained the injunction. After performing the statutorily required assessment and weighing of aggravating factors and mitigating circumstances, the jury unanimously recommended that the trial court impose a death sentence for each murder.

*Id.* at 9-11.

At the *Spencer*[2] hearing, Colley said, "This was a horrible, terrible accident and I wish it was different, but it's not. And I'm sorry for all parties involved." *Id.* at 11.

The trial court ultimately

found that the State had proven beyond a reasonable doubt all five aggravating factors[FN3] for Amanda Colley's murder (count I) and all four aggravating factors[FN4] for Lindy Dobbins's murder (count II). The court further found that the defense had established twenty-three mitigating circumstances by the greater weight of the evidence.[FN5] The court concluded that the proven aggravators in the case "far outweigh[ed]" the mitigating circumstances. Accordingly, the court sentenced Colley to death for each murder and imposed sentences for

---

2. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

Colley's other convictions, to run concurrently with the death sentences.[FN6]

> FN3. The trial court assigned the following weight to the aggravating factors for Amanda's murder: (1) Colley was previously convicted of another capital or violent felony (the contemporaneous murder and the attempted murders) (great weight); (2) the capital felony was committed while Colley was engaged in the commission of a burglary (great weight); (3) the capital felony was especially heinous, atrocious, or cruel (great weight); (4) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (moderate weight); (5) the capital felony was committed by a person subject to an injunction and was committed against the petitioner who obtained the injunction (great weight).
>
> FN4. The trial court assigned the following weight to the aggravating factors for Lindy's murder: (1) Colley was previously convicted of another capital or violent felony (the contemporaneous murder and the attempted murders of Lamar Douberly and Rachel Hendricks) (great weight); (2) the capital felony was committed while Colley was engaged in the commission of a burglary (great weight); (3) the capital felony was especially heinous, atrocious, or cruel (great weight); (4) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (moderate weight).
>
> FN5. The trial court assigned the following weight to the mitigating circumstances: (1)

Colley was a good father to his children (very slight weight); (2) Colley was a good worker (slight weight); (3) Colley was a good son (slight weight); (4) Colley was a good brother (slight weight); (5) Colley was gainfully employed at the time of his arrest (slight weight); (6) Colley has maintained stable employment (slight weight); (7) Colley was a mentor to fellow employees (slight weight); (8) Colley did various charitable works through his employment (slight weight); (9) Colley was a great uncle (slight weight); (10) Colley witnessed domestic violence by his mother on his father as a child (slight weight); (11) Colley has a history of drug and chronic alcohol abuse (moderate weight); (12) Colley is impulsive (slight weight); (13) Colley loves animals (very slight weight); (14) Colley was a positive influence on other children in the neighborhood (very slight weight); (15) Colley volunteered as a baseball coach (slight weight); (16) Colley volunteered as a football coach (slight weight); (17) Colley was previously active in race car driving (slight weight); (18) Colley tried to go through marriage counseling with his wife (slight weight); (19) Colley was taking pain, antidepressant, and sleep disorder medications at the time of the homicides (slight weight); (20) Colley had previously been diagnosed with depression (moderate weight); (21) Colley has adjusted well to his incarceration since being arrested in this case (slight weight); (22) Colley has no prior felony convictions prior to the date of the incidents in this case (moderate weight); (23) the existence of any other factors in Colley's character, background, or life or the circumstances of the offense that would mitigate against the imposition of the death penalty (slight weight).

FN6. For the attempted first-degree murder of Lamar Douberly (count III), the court sentenced Colley to life in prison, with a twenty-year mandatory minimum. For the attempted first-degree felony murder of Rachel Hendricks (count IV), the court sentenced Colley to life in prison, with a twenty-year mandatory minimum. For burglary of a dwelling with an assault or battery with a firearm (count V), the court sentenced Colley to life in prison, with a lifetime mandatory minimum. For burglary of a dwelling (count VI), the court sentenced Colley to fifteen years. And for aggravated stalking (count VII), the court sentenced Colley to five years.

*Id.* at 11-12. We affirmed Colley's convictions and sentences on direct appeal,[3] *id.* at 19, and the United States Supreme Court

---

3. Colley raised the following issues on direct appeal:

(1) the trial court erred in instructing on and finding the CCP aggravator; (2) the trial court erred in instructing on and finding the HAC aggravator; (3) Florida's death penalty statute fails to genuinely narrow the class of persons eligible for the death penalty and is therefore unconstitutional; (4) the trial court abused its discretion in rejecting Colley's two proposed impairment mitigators; (5) the trial court erred in allowing victim impact evidence in general and in allowing the victim impact statement "think of all of the lives she has blessed" to be read to the jury; (6) the prosecutor's penalty phase closing argument violated Colley's constitutional rights; and (7) Colley's death sentences are a disproportionate punishment.

*Colley*, 310 So. 3d at 12-13.

denied certiorari review, *Colley v. Florida*, 142 S. Ct. 144 (2021).

Colley filed his "Motion to Vacate Judgment of Conviction and Sentence of Death Pursuant to Florida Rule of Criminal Procedure 3.851" in 2022, raising eleven claims, all of which were denied. Colley now appeals the denial of postconviction relief and has also filed a petition for a writ of habeas corpus, raising three claims of ineffective assistance of appellate counsel and a claim of fundamental error and manifest injustice.

## II.  POSTCONVICTION APPEAL

We address each of Colley's postconviction claims in turn.

### A.  Ineffective Assistance of Counsel

#### 1.  *Conceding Second-Degree Murder*

Colley first argues that the postconviction court erred in summarily denying his claim that trial counsel violated *McCoy v. Louisiana*, 584 U.S. 414 (2018), and created structural error by conceding Colley's guilt of second-degree murder and further erred by failing to find trial counsel ineffective for making the concession without Colley's knowledge or permission.  Colley asserts that he insisted to counsel that he would only concede his guilt of manslaughter.

- 13 -

*McCoy* was not violated. Before trial, the court conducted a colloquy with Colley during which he expressed agreement with counsel's strategy to concede that he was the person who committed the shootings at Amanda's home and described the shootings as "a horrible accident." In *McCoy*, the defendant—who was charged with the murders of three relatives of his estranged wife—"vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt" at trial by his counsel, but counsel nonetheless made a strategic decision to concede guilt. *Id.* at 417-20. The Supreme Court held that when a defendant expressly asserts that the objective of his defense is to maintain factual innocence, counsel may not override that objective by conceding guilt. *Id.* at 423, 426.

This case is materially different than *McCoy*. Colley did not insist that he was innocent of the charged acts; he admitted that he was the shooter. His disagreement was not with counsel's admission that he committed the shootings, but with counsel's decision to characterize the offenses as second-degree murder rather than manslaughter. The record does not reflect a clear objection to counsel conceding his guilt of second-degree murder.

- 14 -

Colley's admission that he was the shooter and the absence of a clear objection to counsel's concession distinguish this case from *McCoy* such that its holding is inapplicable. Accordingly, Colley is not entitled to relief under *McCoy*.

We next consider whether the circuit court erred in rejecting Colley's ineffective assistance claim. Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668, 686-88 (1984). To prevail under *Strickland*, a defendant must show both that trial counsel's performance was deficient, and that the deficient performance prejudiced the defendant. *Id.* at 687. As to the first prong, the defendant must establish "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* A defendant alleging that he or she received ineffective assistance of counsel has the burden to demonstrate that counsel's performance fell below an objective standard of reasonableness, and great deference is given to counsel's performance. *Id.* at 686-89. This Court has made clear that "[s]trategic decisions do not constitute ineffective assistance of counsel." *Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000).

- 15 -

To establish prejudice, a defendant must demonstrate a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "Where the defendant claims counsel rendered ineffective assistance in the penalty phase, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Hayward v. State,* 183 So. 3d 286, 297 (Fla. 2015) (alteration in original) (quoting *Strickland,* 466 U.S. at 695).

Both deficient performance and prejudice must be shown to obtain relief. *Strickland,* 466 U.S. at 694. But "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. "Because both prongs of the *Strickland* test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal

conclusions de novo." *Davis v. State*, 383 So. 3d 717, 733 (Fla.) (quoting *Sheppard v. State*, 338 So. 3d 803, 816 (Fla. 2022)), *cert. denied*, 145 S. Ct. 248 (2024).

In opening statement, counsel told the jury that "this isn't a case of premeditated first-degree murder or first-degree felony murder or attempted first-degree murder," but instead "falls more in the line of either second-degree [murder] . . . or even possibly manslaughter." In closing, counsel argued that the State failed to prove premeditation or felony murder, because Colley committed only a trespass with a firearm, and asked the jury to return verdicts of second-degree murder.

At the evidentiary hearing, counsel testified that they explained to Colley that this was not a manslaughter case and that they were going to "shoot" for second-degree murder to try to save his life. Colley testified that he assumed he was guilty of manslaughter due to this being a crime of passion and him being intoxicated at the time and said that he never gave counsel permission to concede second-degree murder.

As framed on appeal, Colley's claim is that counsel was ineffective "for conceding Colley's guilt to second-degree murder

- 17 -

without his client's knowledge or permission, as Colley always insisted that he would only concede his guilt to manslaughter." Initial Brief of Appellant at 14. He relies on *Florida v. Nixon*, 543 U.S. 175 (2004), arguing that counsel failed to adequately explain trial strategy. *Nixon* requires counsel to both consult the defendant and obtain his consent regarding whether to plead guilty, waive a jury, testify, and appeal. *Id.* at 187. But *Nixon* does not require counsel to obtain a defendant's consent to every tactical decision, including which lesser offense to concede. Choosing to concede guilt to a particular lesser-included offense, where the defendant admits being the actor and does not pursue a claim of factual innocence, is a matter of trial strategy within counsel's authority.

The circuit court reasonably concluded that the decision to concede second-degree murder was sound trial strategy. Counsel testified that arguing only for manslaughter would have undermined his credibility with the jury, especially given that Colley can be heard on the 911 call saying "fucking whore[] and shoot[ing] twice." Colley has not overcome the presumption that this was a reasonable strategic choice under the circumstances.

Nor has Colley established prejudice. The jury was instructed on first-degree premeditated murder, first-degree felony murder, second-degree murder, and manslaughter, yet found Colley guilty of both of the highest charges: first-degree premeditated murder and first-degree felony murder. Given those verdicts, there is no reasonable probability Colley would have been acquitted of first-degree murder even if counsel had limited the concessions on the murder counts to manslaughter.

Because Colley has neither shown a violation of *McCoy* nor ineffective assistance, the circuit court did not err in denying relief on this claim.

### 2. *Failure to Prepare Colley to Testify*

Colley argues that counsel was ineffective for failing to prepare him to testify in his own defense and that the circuit court erred in denying this claim.

At trial, after the State rested, the court advised Colley that the decision whether to testify was his alone. The next morning, the trial court conducted a full colloquy confirming that Colley understood his rights, had consulted with counsel, did not need additional time, and was "satisfied" with counsel's advice. Colley

affirmatively told the court that his decision not to testify was his own.

At the evidentiary hearing, counsel testified that they recommended to Colley that he not testify because doing so would very likely hurt his case, but it was Colley alone who ultimately made the decision. Colley testified at the evidentiary hearing that he "always" told counsel that he wanted to testify, but he felt "bullied" by counsel not to. Colley said he told the trial court that he did not want to testify because he was unprepared.

The circuit court concluded that Colley freely and voluntarily waived his right to testify. This finding is supported by competent, substantial evidence. When Colley stated that his decision not to testify was based on counsel's recommendation, the trial court asked follow-up questions to clarify and ensure that Colley understood it was solely his decision to make and not up to his lawyers. Despite being given ample opportunity by the trial court on multiple occasions, Colley never advised the trial court that he felt bullied or coerced by counsel, or that he wanted to testify but was unprepared. Colley also stated under oath that he was satisfied with counsel's advice regarding whether to testify. If he

truly wished to testify but was hesitant to do so based upon counsel's alleged unpreparedness, that sworn testimony was untruthful. Colley is in no position to complain about circumstances that were facilitated by his own false statement. *See Polk v. State*, 56 So. 3d 804, 808 (Fla. 2d DCA 2011) ("[A] defendant should be estopped to receive an evidentiary hearing on a postconviction claim when the basis of the claim is that he lied under oath at the relevant hearing." (citing *Iacono v. State*, 930 So. 2d 829, 831-32 (Fla. 4th DCA 2006) (recognizing that defendants "are bound by their sworn answers"))).

The circuit court also found that trial counsel's recommendation was reasonable. Colley's testimony would have exposed him to damaging cross-examination on threats and statements he made to Amanda, inconsistencies between his trial testimony and what he told mental health experts, and his ability to ask sophisticated legal questions on the morning of the murders despite being very intoxicated or experiencing a parasomnia or fugue state, as the defense claimed. Counsel reasonably concluded that Colley's testimony would add little and risk significant harm.

Colley also failed to establish prejudice. His proffered testimony would not have yielded a reasonable probability that he would have been acquitted of any of the charges or convicted of only lesser offenses. The jury heard the substance of Colley's proffered testimony through his mitigation experts but still returned unanimous death recommendations. The circuit court did not err in denying relief on this claim.

3. *Failure to Challenge the Testimony of Brittany Manno*

Colley argues that the circuit court erred in summarily denying his claim that trial counsel was ineffective for failing to adequately investigate and challenge the testimony of Brittany Manno.

Manno, a pet sitter, testified briefly for the State at trial that on the morning of the murders, she arrived at a home on Garrison Drive to walk a puppy. As she began the walk, she noticed James Colley, Sr., sitting on a bench three houses down, who appeared distressed and was speaking loudly on speakerphone. She overheard him pleading, "Please, please, son, come back and get your truck. Don't do this. Everybody knows what you've been

through."  As she was walking by, she heard the person on the other end of the call say, "I can't f***ing take this anymore."

In his postconviction motion, Colley asserted that Manno was at least 102 feet away from Colley, Sr., and that audio expert Bruce Koenig would have testified that it would be highly unlikely that a person more than thirty feet away could have heard the conversation.  He also alleged that counsel inadequately cross-examined Manno and failed to preserve objections to her testimony.  At the case management conference, he argued that Manno's testimony provided the most damaging evidence that the murders were premeditated.  The circuit court summarily denied the claim, finding no prejudice because the evidence of premeditation was overwhelming even without Manno's testimony.

The circuit court did not err.  On direct appeal, we relied primarily on the testimony of Rachel Hendricks and Colley's actions in "arming himself in advance, approaching Amanda's home in a manner calculated to avoid detection, and shooting into the house from outside without any provocation" to find sufficient evidence of not just premeditation, but the heightened premeditation necessary to sustain the CCP aggravator.  Because evidence of premeditation

- 23 -

was already substantial and independent of Manno's testimony, Colley failed to establish prejudice.

### 4. *Detective English*

#### a. Failure to Object to Detective English Sitting with the Prosecution

Before trial, the State moved to exempt the lead detective, Samantha English, from the rule of sequestration and allow her to sit at the prosecution table, asserting her presence was essential and necessary to the presentation of the State's case. The motion was granted, and Detective English did sit at the State's table during portions of the trial. In his motion for postconviction relief, Colley argued that trial counsel was ineffective for failing to object because her presence there was "unnecessary and prejudicial."

The circuit court summarily denied the claim, finding no deficiency because any objection would have been overruled due to Detective English's innocuous testimony—which did not serve to prove any element of any crime but to give the jury a timeline of events and to enter a surveillance video into evidence. The circuit court found no prejudice because Colley failed to explain how Detective English's presence at the State's table indicated she was

"on their team" to any greater degree than her position as the lead investigator inherently suggested.

The circuit court did not err. "The purpose of the rule of sequestration is 'to avoid a witness coloring his or her testimony by hearing the testimony of another,' thereby discouraging 'fabrication, inaccuracy and collusion.' " *Knight v. State*, 746 So. 2d 423, 430 (Fla. 1998) (quoting Charles W. Ehrhardt, *Florida Evidence* § 616.1, at 506 (1998 ed.)). The rule "is not an absolute that must be invoked at the mere request of counsel." *Hilton v. State*, 117 So. 3d 742, 751 (Fla. 2013). Section 90.616(2)(c), Florida Statutes (2018), allows an exception to the rule of sequestration when a witness's "presence is shown by the party's attorney to be essential to the presentation of the party's cause," and a trial court has wide discretion in deciding whether to exempt a witness from sequestration, *Hilton*, 117 So. 3d at 751-52.

In *Garcia v. State*, 949 So. 2d 980, 994 (Fla. 2006), we upheld a similar exemption because the purpose of the detective's testimony was "simply to explain that charges had been filed against the defendant using an alias that also appeared in the payroll records from [his] employer." Because Detective English's

testimony was similarly innocuous, and the exemption was well within the trial court's discretion, any objection would have been meritless. Thus, Colley cannot show that counsel was deficient for failing to object. Nor has Colley shown that there is a reasonable probability that the outcome of the trial would have been different but for Detective English's presence at the State's table during portions of the trial. His claim therefore fails.

### b. Conflict of Interest

Colley next argues that counsel was ineffective for failing to apprise him of a conflict of interest stemming from trial counsel Terry Shoemaker's firm's representation of the St. Johns County Sheriff's Office (SJCSO) until after trial had commenced. At the evidentiary hearing, Shoemaker explained that his partner Dan Mowrey had represented SJCSO deputies in internal affairs and officer-involved shooting matters, and had represented Detective English in three unrelated cases, two predating their firm's formation and one predating its representation of Colley.

The circuit court found no actual conflict under rules 4-1.7(a)[4]

or 4-1.9[5] of the Rules Regulating The Florida Bar.  Because the

---

4.  Rule 4-l.7(a) of the Rules Regulating The Florida Bar addresses conflicts of interest regarding current clients and provides:

> **(a) Representing Adverse Interests.**  Except as provided in subsection (b) [addressing informed consent], a lawyer must not represent a client if:
>
> (1) the representation of 1 client will be directly adverse to another client; or
>
> (2) there is a substantial risk that the representation of 1 or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

5.  Rule 4-1.9 of the Rules Regulating The Florida Bar addresses conflicts of interest involving former clients and provides:

> A lawyer who has formerly represented a client in a matter must not afterwards:
>
> **(a)** represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent;
>
> **(b)** use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client or when the information has become generally known; or

firm's contract with SJCSO entailed administrative representation of deputies and because the prior representations of Detective English were unrelated and concluded before Colley's case, neither created "adverse interests." The court concluded that because there was no conflict, there was no deficiency. The court found no prejudice because Shoemaker advised Colley of the contract and prior representation of Detective English three years before Colley's trial, and Colley chose to allow Shoemaker to represent him anyway.

A claim of ineffective assistance based on conflict requires proof that counsel "actively represented conflicting interests" and that the conflict adversely affected performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980); *Hunter v. State*, 817 So. 2d 786, 791-92 (Fla. 2002). Speculative or hypothetical conflicts are insufficient. Colley has not identified any action or inaction attributable to a divided loyalty, nor any way in which counsel's representation was compromised. Without an actual conflict and an adverse effect, he

---

**(c)** reveal information relating to the representation except as these rules would permit or require with respect to a client.

cannot establish deficiency or prejudice. Because no conflict existed, the timing of the disclosure is immaterial. This subclaim was properly denied.

### 5. *Failure to Call Dr. Krop at the Penalty Phase*

Dr. Krop, a forensic psychologist, was retained by the defense and conducted a confidential psychological evaluation of Colley in November 2015 to assess his competency to proceed and mental state at the time of the offenses, including the availability of any psychological defense such as insanity. Dr. Krop took notes during the evaluation and prepared a "preliminary" report, stating that "Colley provided a detailed account" of his involvement in the murders. The report was disclosed to defense experts and State expert, Dr. Danziger, before trial.

Dr. Danziger testified at trial as a penalty phase rebuttal witness for the State. Dr. Danziger testified that Dr. Krop's report did not mention Colley having any "memory loss, snapshots, blank periods" regarding the events surrounding the murders. Colley argues that counsel was ineffective for failing to rebut this testimony by calling Dr. Krop in surrebuttal or obtaining and using the notes from his evaluation of Colley, which were later obtained

by postconviction counsel and contain isolated phrases such as "flashes," "can't recall everything," "things get foggy," and "doesn't recall shooting."

The circuit court properly denied this claim. Although a few phrases contained within the thirteen pages of Dr. Krop's notes appear to contradict Dr. Danziger's trial testimony, the majority of the notes show that Colley remembered many significant details of the murders, including shooting through the back window at whom he believed to be Amanda and Lamar; entering the house looking for Lamar; and firing twice at the person in the closet, whom he believed to be Lamar. Using the notes—or calling Dr. Krop—would therefore have exposed highly damaging admissions and undermined the defense theory that Colley was substantially impaired by an Ambien-induced parasomnia. Counsel reasonably avoided presenting a "double-edged sword." *See Reed v. State*, 875 So. 2d 415, 437 (Fla. 2004) ("An ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword."). Because Dr. Krop's testimony on this point would have been far more harmful than helpful to Colley's defense, Colley was not prejudiced. Further, Dr.

Danziger's opinion that Colley was not impaired at the time of the murders was based on several factors other than Dr. Krop's report. Thus, even if Dr. Danziger had not relied on or testified about the information contained in Dr. Krop's report, his testimony would not have changed substantially, and there is no reasonable probability that Colley would have received life sentences.

Colley also claims that counsel was ineffective for failing to object to Dr. Danziger's references to Dr. Krop's report as inadmissible hearsay. But at a capital penalty phase, "[a]ny such evidence that the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements." § 921.141(1), Fla. Stat. (2018). The trial court offered Colley the opportunity to present surrebuttal, and Dr. Krop would have been willing to testify. Thus, because Colley was accorded a fair opportunity to rebut the statements, which were probative, any hearsay objection would have been meritless, and counsel cannot be deficient for failing to make a meritless objection.

Colley presents a brief argument based on the Confrontation Clause. But the argument is vague, undeveloped, and conclusory. We reject the argument both as insufficiently briefed, *see, e.g.*, *Heath v. State*, 3 So. 3d 1017, 1029 n.8 (Fla. 2009) ("Vague and conclusory allegations on appeal are insufficient to warrant relief."), and meritless under *Crawford v. Washington*, 541 U.S. 36 (2004).

Finally, Colley argues that disclosing Dr. Krop's report violated the attorney-client privilege. While reports of competency evaluations done by experts retained solely to evaluate competency have been held to be protected by attorney-client privilege, *see, e.g.*, *Manuel v. State*, 162 So. 3d 1157, 1161 (Fla. 5th DCA 2015) (report of expert privately retained by defense counsel for the sole purpose of evaluating competency was protected by the attorney-client privilege and not subject to disclosure absent a waiver of confidentiality), Dr. Krop was not retained for the sole purpose of evaluating Colley's competency, and only a single sentence in his report addressed competency. And even if nondisclosure might have been better strategy in hindsight, Colley has not rebutted the strong presumption that counsel acted reasonably. *Strickland* does not guarantee perfect representation, nor is there an "expectation

that competent counsel will be a flawless strategist or tactician."
*Harrington v. Richter*, 562 U.S. 86, 110 (2011).  Moreover, Colley has not established prejudice.  Dr. Danziger's opinions on whether Colley or his memory was impaired rested on several independent grounds and would not have differed had he not seen Dr. Krop's report.

Because calling Dr. Krop or using his notes would have harmed the defense, and because no prejudice resulted from any alleged error, the circuit court properly denied relief on this claim.

6. *Failure to Challenge the Admissibility of Judge Tinlin's Testimony and Seek Disqualification of the Seventh Judicial Circuit*

a.  Failure to Object to Judge Tinlin's Testimony

Colley first argues that the trial court erred in summarily denying his claim that counsel was ineffective for failing to move to exclude Judge Tinlin's testimony.  Judge Tinlin accepted Colley's change of plea in the injunction violation case on the morning of the murders.  Judge Tinlin testified at trial that Colley stated under oath at the plea hearing that he was not under the influence of any intoxicants and that his appropriate demeanor and relevant questions reflected no signs of impairment.  A video of the plea

colloquy—that counsel did, unsuccessfully, move to exclude—was also introduced through Judge Tinlin and played for the jury.

In denying this claim, the circuit court concluded that Judge Tinlin testified only as a fact witness regarding his observations of Colley hours before the murders. His observations were relevant to rebut the assertion that Colley was under the influence when he committed the murders, and his testimony was admissible. The testimony was not offered to prove an aggravator or any disputed element. And the video allowed the jury to witness Colley's demeanor independently, rather than relying on the judge's status. The circuit court also noted that Dr. Danziger had already testified that he reviewed a recording of the plea hearing and observed that Colley responded to Judge Tinlin's questions "coherently, logically, appropriately" and that Colley made additional statements in court that morning suggesting that he was "mentally intact."

Colley argues the testimony should have been excluded under section 90.403 as unduly prejudicial because it came from a sitting judge, and that the State should have called the prosecutor or defense attorney from the plea hearing instead. But he identifies no authority suggesting that a judge's factual observations become

inadmissible simply due to judicial office, or that the State must present a less "inflammatory" witness when multiple witnesses have personal knowledge. Colley has not shown that any objection to Judge Tinlin's testimony would have had merit, and counsel cannot be found to have rendered deficient performance for failing to make a meritless objection.

b. Failure to Move to Disqualify the Seventh Judicial Circuit

Colley also claims that trial counsel was ineffective for failing to move to disqualify the entire Seventh Judicial Circuit from presiding over this case due to Judge Tinlin's testimony. He relies on *Wickham v. State*, 998 So. 2d 593 (Fla. 2008), in which this Court required disqualification of the entire Second Judicial Circuit from presiding over a postconviction evidentiary hearing because trial counsel had become a judge in the same circuit. Colley also cites two circuit court cases.

The circuit court properly rejected the claim. The cases cited by Colley involved situations in which a lawyer who was previously a litigant in the case later became a judge in that same circuit. Nothing similar occurred here: Judge Tinlin was never Colley's attorney, was not involved in the prosecution, and simply testified

as a fact witness to events he personally observed. His testimony created no basis to believe that other judges in the circuit would give undue weight to a colleague's factual account, nor any basis to doubt the impartiality of the court.

Because Judge Tinlin's testimony was admissible and provided no ground for circuit-wide disqualification, any motion to disqualify would have been meritless. The circuit court correctly concluded that counsel was not ineffective for failing to make a meritless argument. Colley is not entitled to relief.

### 7. *Failure to Request Pharmacogenomic Testing*

Colley argues that the circuit court erred in denying his claim that counsel was ineffective for failing to have pharmacogenomic testing done of Colley and to present evidence that he is genetically predisposed to be a poor metabolizer of Cymbalta—a fact that was discovered by postconviction pharmacogenomic testing.

At the evidentiary hearing, Dr. Charles Metzger, an internal medicine physician, testified that pharmacogenomic testing—specifically, the GeneSight test—revealed that Colley "has very low enzymes for CYP2D6," which makes him a "poor metabolizer" of Cymbalta and at higher risk of experiencing adverse effects from the

medication, including nausea, insomnia, jitteriness, aggressiveness, agitation, poor decision making, and hostility. Dr. Metzger emphasized, however, that this did not mean Colley could not take Cymbalta—only that he should have begun at a lower dose.

Colley's sister, Ronda, testified that she asked counsel via email about having Colley tested due to her own genetic sensitivities to certain psychiatric medications. Counsel testified that no expert recommended such testing, and because the defense focused on Ambien-induced parasomnia—supported by Colley's reported memory gaps and known Ambien side effects—genetic testing on Cymbalta was not pursued.

Dr. Buffington testified that he did not recommend genetic testing before trial, and he "would have had no way to know that [Colley] had a genetic point mutation," but if he had known that Ronda was a poor metabolizer, he would have recommended that Colley and his siblings have the genetic testing so they could understand their clinical risk with future drug therapy. Dr. Buffington initially said that Colley's GeneSight report would have supported his penalty phase testimony, but on cross-examination, he changed course and said that the GeneSight results would have

shifted his view and made Cymbalta—not Ambien—the more likely causative factor for Colley.

In denying relief, the circuit court concluded that trial counsel made a reasonable strategic decision not to pursue pharmacogenomic testing because the defense experts were focused on Ambien, not Cymbalta. Competent, substantial evidence supports this finding. Counsel was entitled to rely on qualified mental health experts, particularly where multiple experts knew the medications Colley was taking, knew the potential side effects, and knew that a first-degree relative has medication sensitivities. As this Court has held, "[c]ounsel cannot be found deficient for relying on the evaluations of qualified mental health experts, 'even if, in retrospect, those evaluations may not have been as complete as others may desire.' " *Carter v. State*, 175 So. 3d 761, 775 (Fla. 2015) (quoting *Jennings v. State*, 123 So. 3d 1101, 1116 (Fla. 2013)). The court also questioned the credibility of Dr. Buffington's postconviction shift in opinion given his trial testimony that Colley was suffering from an Ambien-induced parasomnia. If a genetic sensitivity to Cymbalta—which occurs in 5-10% of Caucasians— would have better explained Colley's behavior on the morning of the

murders than an Ambien-induced parasomnia, the court reasoned that Dr. Buffington, who was aware of the potential adverse side effects of Cymbalta and the availability of pharmacogenomic testing, would have recommended the testing before trial, but he instead focused on the effect the Ambien may have had on Colley.

Colley likewise failed to establish prejudice. He did not show that pretrial pharmacogenomic testing would have altered the defense strategy nor that pursuing the Ambien defense despite having undergone pretrial testing would have been unreasonable. The symptoms Colley described experiencing at the time of the murders were better aligned with those attributed to Ambien. Even had the jury been told that Colley was genetically predisposed to experience adverse reactions to Cymbalta, there is no reasonable probability that he would have received life sentences. The testing established only that he was at a higher risk of experiencing adverse effects from the medication, not which effects he was likely to experience or whether he actually experienced any. The additional fact that Colley is more likely than 90-95% of Caucasians to experience some adverse reaction to Cymbalta would not have altered the mitigation picture in a way that creates a reasonable

probability of a different outcome. The circuit court did not err in concluding that Colley failed to establish deficiency or prejudice.

### 8. *Failure to Request the Extreme Mental or Emotional Disturbance Mitigating Circumstance*

Section 921.141(7)(b), Florida Statutes (2018), sets forth the statutory mitigating circumstance that "[t]he capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance." Colley alleged that counsel's failure to request that the jury be instructed on this mitigating circumstance constituted ineffective assistance of counsel and that the circuit court erred in denying relief on this claim.

At the evidentiary hearing, trial counsel testified that they did not pursue this mitigator because the defense team decided that the best theory of defense was based not on mental or emotional disturbance but the medications and other substances Colley was using at the time of the murders.

Colley presented two postconviction experts at the evidentiary hearing, Jacquelyn Olander, Ph.D., a neuropsychologist, and Michael Maher, M.D., a psychiatrist, both of whom testified that

- 40 -

Colley was under an extreme mental or emotional disturbance at the time of the murders.

Dr. Olander claimed that the "trauma" Colley experienced on the day of the murders—which she described as "words" that were said to him—caused him to decompensate into a rage reaction. She pointed to neuropsychological testing she conducted, which showed deficits in non-verbal learning, coping, self-esteem, executive functioning, and social skills. Although she initially said that a finding of extreme mental or emotional disturbance is inconsistent with a dissociative state due to parasomnia, she later reversed herself and said the two could coexist.

Dr. Maher attributed the extreme mental or emotional disturbance to a diagnosis of PTSD and the "excessive" dose of Cymbalta. Dr. Maher said that a dissociative episode is an extreme emotional state.

Dr. Demery, a neuropsychologist who testified for the State in rebuttal, said that Colley's neuropsychological testing was normal and showed no impairment.

The circuit court found Dr. Demery to be the more credible expert, relying in part on Colley's own trial neuropsychologist, Dr.

Quiroga, who had also found no deficits and no dissociative state. The circuit court also rejected Dr. Maher's opinion because it was founded on a PTSD diagnosis made by Dr. Maher, which was based partly on Colley's reported adverse childhood experiences, the veracity of which the court found had "significant issues."

The court concluded that trial counsel made a reasonable and prudent strategic decision not to pursue the extreme mental or emotional disturbance mitigator because it conflicted with the defense theory that the murders occurred due to the substantial impairment Colley experienced from the Ambien and possibly other substances.

We find no error in the circuit court's conclusion. It cannot be said that counsel's performance fell below an objective standard of reasonableness or that Colley has met his burden to overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Further, Colley has failed to establish prejudice. Even if the jury and the trial court had found the mitigator established, there is no reasonable probability that it would have affected the balance of the aggravators and mitigators such that the five aggravators—three of which (HAC,

CCP, and prior violent felony) are among the weightiest of the aggravators, *Hodges v. State*, 55 So. 3d 515, 542 (Fla. 2010) (prior violent felony and HAC); *Wade v. State*, 41 So. 3d 857, 879 (Fla. 2010) (HAC and CCP)—would no longer have outweighed the mitigating circumstances.

### 9. *Failure to Present Significant Mitigation Concerning Colley's Background*

Colley argues that the trial court erred in denying his claim that trial counsel was ineffective for failing to investigate and present mitigating evidence of the trauma that Colley experienced during childhood. He contends that counsel should have hired an expert to administer the Adverse Childhood Experience (ACE) questionnaire, which he claims would have prompted him and his family to disclose the alleged abuse, which was not disclosed to the defense team before trial. The circuit court denied relief.

Postconviction counsel retained Bryanna Fox, Ph.D., a professor of criminology, who administered the ACE questionnaire, the Life Events Checklist, and the Traumatic History Interview in preparation for the postconviction proceedings. Dr. Fox found that Colley experienced five of the ten ACEs: physical abuse, sexual

- 43 -

abuse, emotional abuse, witnessing household violence, and household mental illness. None of this information had been disclosed to trial counsel despite their efforts to discover mitigation of this type.

Trial counsel testified at the evidentiary hearing that Colley's family was asked about any physical or sexual abuse or threats of abuse or trauma that Colley may have experienced, but the family reported that it had a good, healthy family relationship, and no trauma or abuse was revealed besides the two domestic violence incidents between Colley's parents that were presented at the penalty phase.[6] Colley likewise told Dr. Krop that he had no history of physical or sexual abuse. Although Dr. Krop did not use the ACE questionnaire, Dr. Demery testified at the evidentiary hearing that

---

6. Colley's sister, Crystal, testified at the penalty phase that when she was fourteen and her mother learned her father was having an affair, she witnessed her mother hit her father with a baseball bat. Four or five days after the baseball bat incident, Colley's mother came to the house to see the children for Thanksgiving, but Colley's father was not going to let her into the house, so Colley's mother grabbed a knife and said that she was coming in. Colley was nine years old at the time, and while he was home during the baseball bat incident, Crystal said she sent him to his room as the hitting began, so he did not actually see his mother hit his father. He only actually witnessed the knife incident.

Dr. Krop's unstructured interview covered the same areas as the ACE questionnaire.

Under *Strickland*, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." 466 U.S. at 691. This Court has made clear that trial counsel is not ineffective for failing to discover mitigation that the defendant and his family have failed to disclose. *Hall v. State*, 212 So. 3d 1001, 1026 (Fla. 2017) (finding no deficiency in counsel's mitigation investigation where defendant and his family were not forthcoming with information concerning his mother's infidelity); *Asay v. State*, 769 So. 2d 974, 987-88 (Fla. 2000) (finding no ineffectiveness for failing to discover that the defendant was sexually abused when the defendant and his family were not forthcoming with the information, even though trial counsel was aware of the defendant's rough childhood); *Diaz v. State*, 132 So. 3d 93, 114 (Fla. 2013) (finding no ineffectiveness for failing to discover information regarding sexual abuse that defendant and his family did not disclose). Nor will counsel be deemed to have performed deficiently for failing to verify information provided by defendant and his family where counsel had no reason

- 45 -

to believe the information was untruthful and no reason to explore its existence. *E.g.*, *Brant v. State*, 197 So. 3d 1051, 1067 (Fla. 2016) (concluding that counsel's performance was not deficient for failing to verify defendant's paternity through other family members or DNA testing where defendant's mother testified to the identity of defendant's father). In light of the conflicting evidence presented at trial, the additional mitigating evidence that was presented through Dr. Fox was minor; thus, confidence in the outcome of the penalty phase is not undermined. *See Hilton v. State*, 326 So. 3d 640, 649 (Fla. 2021) ("Where the additional mitigation is minor or cumulative and the aggravating circumstances substantial, we have held that confidence in the outcome of the penalty phase is not undermined.").

### 10.  *Failure to Call Brofford and Rockenbach*

Colley argues that counsel was ineffective for failing to call witnesses Heather Brofford and James Rockenbach to present mitigation.

The trial court did not err in finding that counsel was not ineffective for failing to call Brofford. Brofford, a family friend of the Colleys since 2011, testified at the evidentiary hearing that Colley

- 46 -

was a friendly, loving father, who was distraught over his failing marriage. This proposed testimony would have been cumulative. Evidence that Colley was a good father was presented by several witnesses, submitted to the jury, and found by the trial court to have been established. Counsel is not ineffective for failing to elicit such cumulative testimony, nor was Colley prejudiced by the lack of cumulative testimony. *See Dufour v. State*, 905 So. 2d 42, 61 (Fla. 2005) (holding that defendant failed to demonstrate prejudice where additional mitigating evidence did not substantially differ from that presented during the penalty phase).

Rockenbach, who died before the evidentiary hearing, signed an affidavit describing Colley as friendly, positive, and encouraging of others to attend the Bible study at the jail led by Rockenbach. Trial counsel testified that they had never heard of him, and Colley did not claim that he told counsel about Rockenbach.

No evidence was presented that counsel had any notice of Rockenbach's existence or that counsel's mitigation investigation unreasonably failed to discover him or the substance of his testimony. Further, Colley was not prejudiced. There was testimony during the penalty phase of Colley's good character

before and after the murders, and the trial court found mitigating that Colley had adjusted well to incarceration, helped other inmates, and had made positive accomplishments while incarcerated. Rockenbach's testimony would have added nothing materially new.

Because Colley showed neither deficient performance nor prejudice as to either witness, the circuit court did not err in denying this claim.

## B. Cumulative Error/Prejudice

Colley argues that his ten ineffective assistance of counsel claims, when assessed as a whole, contributed to his convictions and death sentences. But claims where no deficiency is found cannot be aggregated to establish any cumulative deficiency or error. Even assuming that Colley is attempting to argue cumulative prejudice and assuming that counsel was deficient with regard to Brittany Manno's testimony, no cumulative analysis is required. *See, e.g., Fletcher v. State,* 168 So. 3d 186, 220 (Fla. 2015) (holding that no cumulative error analysis is necessary when only one error is found).

## III. PETITION FOR A WRIT OF HABEAS CORPUS

Colley has also filed a petition for a writ of habeas corpus in this Court, raising three claims of ineffective assistance of appellate counsel and a claim of fundamental error/manifest injustice.

### A. Ineffective Assistance of Appellate Counsel

This Court has explained the standard of review for claims of ineffective assistance of appellate counsel as follows:

> "The standard of review for ineffective appellate counsel claims mirrors the *Strickland* standard for ineffective assistance of trial counsel." [*Wickham v. State*, 124 So. 3d 841, 863 (Fla. 2013).] Specifically, to be entitled to habeas relief on the basis of ineffective assistance of appellate counsel, the defendant must establish
>
>> [first, that] the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, [that] the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
>
> *Bradley v. State*, 33 So. 3d 664, 684 (Fla. 2010) (quoting *Pope v. Wainwright*, 496 So. 2d 798, 800 (Fla. 1986)). Further, "appellate counsel cannot be deemed ineffective for failing to raise nonmeritorious claims." *Valle v. Moore*, 837 So. 2d 905, 908 (Fla. 2002).

*England v. State*, 151 So. 3d 1132, 1140 (Fla. 2014) (second and third alterations in original).

*1. Failure to Challenge the Denial of Motion for Change of Venue*

Colley moved for a change of venue due to pretrial news articles written about the case, most of which were published in the online version of the St. Augustine Record during the initial investigation in 2015, with a few published in 2016 and 2017. The trial court denied the motion after considering the factors set out in *Rolling v. State*, 695 So. 2d 278, 285 (Fla. 1997), to evaluate the nature and effect of any pretrial publicity on the knowledge and impartiality of prospective jurors. Those factors are: (1) the timing of the publicity; (2) whether the coverage was factual or inflammatory; (3) whether the news stories consisted of the police or prosecutor's version of the offense to the exclusion of the defendant's version; (4) the size of the community in question; and (5) whether the defendant exhausted all of his peremptory challenges. *Id.*

The trial court noted the approximate population and that the articles tapered off over time; no articles appeared inflammatory; the articles contained the police version of events; and the case had not reached the stage where exhaustion of peremptory challenges could be assessed. The State further pointed out that it would

likely be three years between the murders and the trial[7] and that most of the articles published after 2015 dealt with the broader issues surrounding capital litigation in St. Johns County in the wake of *Hurst v. Florida*, 577 U.S. 92 (2016).

The trial court said that it would revisit the issue of venue if voir dire revealed pervasive knowledge or fixed opinions among the prospective jurors, but Colley never renewed his objection to the venue or renewed the motion. In fact, after the jury was selected, Colley stated—without being asked—that he was "extremely happy with the jury."

To prevail on this habeas claim, Colley must first show that the trial court erred in denying his motion for a change of venue, the denial of which is reviewed for abuse of discretion. *Hilton*, 326 So. 3d at 652. The trial court's factual determinations are supported by the record, and it applied the correct law. Although Colley alleges that there were veniremen who had been exposed to the pretrial publicity and that some of them had formed fixed

---

7. Ultimately, nearly thirty-five months elapsed between the murders and the trial.

opinions about the case, he does not allege that any of those prospective jurors actually sat on his jury. He has advanced no specific allegations of prejudice, and there is no evidence that the media coverage actually tainted his trial.

Because a claim on appeal that the trial court abused its discretion in denying Colley's motion for change of venue would have been meritless, appellate counsel was not ineffective for failing to raise it. *England*, 151 So. 3d at 1140 (quoting *Valle*, 837 So. 2d at 908). Colley is not entitled to relief.

### *2. Failure to Challenge the Denial of a Jury Expert*

Colley contends that appellate counsel was ineffective for failing to challenge the denial of his motion for a jury selection expert. To prevail, Colley first has to show that the trial court erred in denying the motion. "A trial court's refusal to provide funds for the appointment of experts for an indigent defendant will not be disturbed unless there has been an abuse of discretion." *San Martin v. State*, 705 So. 2d 1337, 1347 (Fla. 1997). "In evaluating whether there was an abuse of discretion, courts have applied a two-part test: (1) whether the defendant made a particularized showing of need; and (2) whether the defendant was prejudiced by

the court's denial of the motion requesting the expert assistance."
*Id.*

At the hearing on Colley's motion, the trial court learned that both trial counsel had extensive experience practicing criminal law and that counsel Garry Wood had handled capital cases for more than twenty-five years. In denying the motion, the trial court found no particularized need for a jury consultant and relied on *San Martin*. In *San Martin*, we upheld the denial of a similar request, stating that "jury selection is a legal function that should be within the competence of experienced trial lawyers" and finding that "defense counsel made no particularized showing of need [but] merely stated that due process required appointment of such an expert where the State sought the death penalty." *Id.* The trial court found that the circumstances in *San Martin* were similar to those here.

The trial court did not abuse its discretion. "A court abuses its discretion only when the judicial action is arbitrary, fanciful, or unreasonable . . . ." *Smith v. State*, 139 So. 3d 839, 846 (Fla. 2014) (quoting *Frances v. State*, 970 So. 2d 806, 817 (Fla. 2007)). Given trial counsel's extensive experience and the absence of any

particularized showing of need for a jury consultant, the trial court was well within its discretion in denying the motion.

Colley also cannot show prejudice. Colley told the trial court that he was "extremely happy with the jury," and he has not shown that any actually biased jurors sat on the jury. Any claim on appeal that the trial court abused its discretion in denying Colley's motion would have been meritless, and "appellate counsel cannot be deemed ineffective for failing to raise nonmeritorious claims." *England*, 151 So. 3d at 1140 (quoting *Valle,* 837 So. 2d at 908). Colley is not entitled to relief.

### 3. Failure to Challenge Judge Tinlin's Testimony

Colley argues that appellate counsel was ineffective for failing to raise a claim that fundamental error occurred when Judge Tinlin was permitted to testify that Colley was not impaired during his court appearance on the morning of the murders. But this claim is barred.

This Court has explained that claims of ineffective assistance of appellate counsel raised in a habeas petition are procedurally barred when they are "permutations of claims" raised in a postconviction motion. *Calhoun v. State,* 312 So. 3d 826, 854 (Fla.

2019).  Defendants cannot relitigate the substance of postconviction claims in a habeas petition under the guise of ineffective assistance of appellate counsel.  *Id.*; *see Knight v. State*, 923 So. 2d 387, 395 (Fla. 2005) ("[C]laims [that] were raised in [a] postconviction motion . . . cannot be relitigated in a habeas petition.").

Colley's argument that fundamental error occurred when Judge Tinlin testified in the penalty phase is simply a repackaged version of postconviction issue six, in which he argued that trial counsel was ineffective for failing to challenge the admissibility of that testimony.  Because the substance of this claim has already been litigated, it is procedurally barred from being raised in this habeas petition.

## B.  Fundamental Error and Manifest Injustice Regarding Burglary and Felony Murder

Colley argues that his burglary and felony murder convictions constitute fundamental error and a manifest injustice to convict him of burglary and felony murder because, despite the active domestic violence injunction, no longer living in the marital home, and arriving armed with two guns and shooting out the back sliding glass door before entering to continue firing at Amanda and the

other occupants, he believed he had permission to enter the home because Amanda had previously invited him to visit during the injunction.

This argument is meritless. Even assuming that Colley owned the marital home, he concedes that ownership for the purpose of charging burglary differs from ownership in property law, as burglary is a disturbance to habitable security instead of to the fee, and that ownership in the burglary context can be defined as any possession that is rightful as against a burglar, and can be proven by special or temporary ownership, possession, or control. Amanda had possession of the marital home that was rightful as against a burglar. Despite any previous invitations she may have extended to Colley to visit her at the marital home, there is nothing to suggest that she invited Colley on August 27, 2015. And even if a "standing invitation" existed, a reasonable person would understand that any such invitation was revoked the moment Colley shot through the sliding glass door at Amanda and her friends inside. It is totally unreasonable to suggest that Colley could have believed he was welcome to enter by violently destroying the door and immediately opening fire.

Colley was not living at the marital home on August 27, 2015; Colley was not invited to the marital home on August 27, 2015; and Amanda was entitled to habitable security in the home. That security was violated both in the early morning hours, when Colley ransacked the home, and later that morning, when Colley shot out the sliding door and entered with the intent to continue shooting at the people inside. The jury was properly instructed, heard evidence from both sides, and found the elements of burglary and felony murder proven beyond a reasonable doubt. There was no fundamental error or manifest injustice, and Colley is not entitled to relief.

## IV. CONCLUSION

For the above reasons, we affirm the denial of postconviction relief and deny the petition for a writ of habeas corpus.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., concurs in result and dissents in part with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result and dissenting in part.

Ultimately, I concur with the majority's affirmance of the circuit court order denying postconviction relief and this Court's denial of habeas relief. However, I write separately and dissent in part because of my serious concerns about the State's reliance on the penalty phase testimony of Judge Tinlin to rebut Colley's defense of impairment.

To be sure, Colley's demeanor during a change of plea hearing on the morning of the murders is relevant to his defense that he was impaired at the time of the murders. However, the question is whether the presiding judge at that hearing was an appropriate witness for the State to call during Colley's penalty phase.

The title of "judge" carries with it a certain weight. In no small manner, the role of the impartial judge—and society's acknowledgment of that role—facilitates the fair and efficient function of our courts. Here, although the substance of Judge Tinlin's testimony was straightforward, it is still the case that the testimony of a sitting judge was offered *by the State* to rebut Colley's defense. Because the topic of Judge Tinlin's testimony was Colley's change of plea hearing on the morning of the murders,

- 58 -

Judge Tinlin's role as a judge—including a mention of his 28 years of judicial experience—was front and center during the testimony.

In my view, it would have been far better for the State to utilize the testimony of another witness such as the prosecutor or the court clerk (1) who was present in the courtroom that day and (2) who could have provided the relevant rebuttal testimony and established the foundation for the video of Colley's plea colloquy. This approach would have avoided any risk of improperly bolstering the State's rebuttal testimony, and it would have avoided the mere perception of prejudice resulting from placing a sitting judge on the witness stand.

I can see no downside to the approach of presenting an alternative witness, especially given that the State also presented the rebuttal testimony of experienced forensic psychiatrist Dr. Jeffrey Danziger. Dr. Danziger provided detailed testimony of Colley's demeanor during the change of plea hearing, and he observed that Colley demonstrated "clearheaded" and "logical[]" thinking. *Colley v. State*, 310 So. 3d 2, 10 (Fla. 2020).

Admittedly, there is no controlling authority prohibiting judges from testifying against a defendant on the ground that such

testimony is prejudicial. However, it stands to reason that the testimony of a judge, especially concerning matters that relate to the judge's position, has the potential to influence a jury's impression of the judge's testimony.

Even though Judge Tinlin's testimony is not expressly prohibited, this does not mean that testimony offered by a sitting judge on behalf of the State is free of any concerns of prejudice. For these reasons, I dissent to the majority's analysis of Colley's claim regarding Judge Tinlin as one of the State's rebuttal witnesses.

An Appeal from the Circuit Court in and for St. Johns County,
    Elizabeth Ann Blackburn, Judge
    Case No. 552015CF001248XXAXMX
And an Original Proceeding – Habeas Corpus

Eric C. Pinkard, Capital Collateral Regional Counsel, Ali A. Shakoor, Assistant Capital Collateral Regional Counsel, Adrienne Joy Shepherd, Assistant Capital Collateral Regional Counsel, and Debra Roganne Bell, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida,

    for Appellant/Petitioner

James Uthmeier, Attorney General, Tallahassee, Florida, and Naomi Nichols, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee/Respondent